# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

VICTOR M. MIRANDA-GUERRERO,
Defendant and Appellant.

S118147

Orange County Superior Court
00WF1146

November 17, 2022

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, Jenkins, and Guerrero concurred.

PEOPLE v. MIRANDA-GUERRERO

S118147


Opinion of the Court by Liu, J.


Defendant Victor M. Miranda-Guerrero was charged with six crimes and convicted of five: kidnapping to commit rape, murder, attempted carjacking, assault with intent to commit rape, and receiving stolen property. The jury could not reach a verdict on an additional assault charge, and it was dismissed. Although Miranda-Guerrero pleaded not guilty to all counts, the defense contested only the murder and assault allegations at trial. The jury found true a special circumstance that the murder occurred during the commission or attempted commission of rape, and it returned a death verdict. We affirm.

## I. FACTS

### A. Guilt Phase

The charged offenses occurred in Huntington Beach between September 1999 and May 2000.

#### 1. September 1999 Kidnapping of Jamie H.

On September 12, 1999, Jamie H. was asleep in her car in a parking structure in downtown Huntington Beach when she was awakened by the driver's side window breaking. Miranda-Guerrero was standing outside Jamie's car, and he began punching her in the face. She fought back and tried to start the car. Miranda-Guerrero grabbed her hair and slammed her head into the car door. He opened the car door, pushed her into the passenger seat, and got into the driver's seat. He threw

1

a backpack into the back seat and told Jamie in broken English that he had "fire," which she took to mean that he had a gun.

Miranda-Guerrero started the car and drove to a residential area. He pulled over, and he and Jamie continued to fight. He unzipped his pants, exposed his erect penis, and told Jamie to get on top of him. She refused. He took a condom out of his pocket, put it on, and tried to kiss Jamie, but she turned away. He started driving again, and when he reached a stop sign, Jamie jumped out of the car. Miranda-Guerrero caught her shirt and dragged her along the street briefly before letting go, at which point she was able to escape with the help of a nearby driver.

Jamie had abrasions on her thigh, elbow, and buttocks from the attack, and a clump of her hair was missing. She got stitches on her eye and lip. A few days later, her car was found with a brick, broken glass, hair, keys, and blood in it. Blood found on Jamie's boots after the attack matched Miranda-Guerrero's DNA.

### 2. *November 1999 Murder of Bridgette Ballas*

#### a. *Prosecution Case*

On the night of November 26, 1999, Bridgette Ballas went out for drinks with a friend in downtown Huntington Beach. They went to Gallagher's Bar for a while and then walked to Aloha Grill, where they met several other people. Ballas's friend left around 1:00 or 1:30 a.m., but Ballas stayed at the bar. Her friend testified that, at that point, Ballas was not staggering or otherwise showing significant signs of impairment. She told police the next day that Ballas had five or six drinks during the time they were together.

Soon after her friend went home, Ballas left Aloha Grill with a small group of people, including an acquaintance with whom they had been sitting. The group walked a short distance to the house of Jason H., where they continued to hang out and drink. One woman who was part of that group testified that Ballas did not appear drunk and was not stumbling during the walk to Jason's house. Ballas told her at one point that she felt "kind of funny" because she did not know anyone at Jason's, and she left the house after 30 or 40 minutes.

Early in the morning of November 27, Richard B. heard someone scream "Oh my God" three times in quick succession. He looked out his window but did not see anything. When he went outside later that morning, he found Ballas lying partially in the street with her head on the curb. She was between two vehicles. Her pants were pulled down and her shirt was pulled up above her breasts, and she was nonresponsive when Richard tried to speak to her. The location where he found her was about seven-tenths of a mile from Jason's house and about a tenth of a mile from her apartment. He covered her with a blanket and called 911.

Ballas was breathing when Officer Juan Munoz arrived, so Munoz called for medical care. She was taken to Western Medical Center for emergency treatment. At that point, she was in a coma. A CT scan showed swelling of her brain and a blood clot on the left side of her brain, which was then surgically removed by Dr. Israel Chambi. Part of her temporal lobe was removed to provide more space for her brain to swell; it was damaged and soft. Dr. Chambi testified that he believed her injuries were consistent with blunt trauma resulting from likely more than one impact.

The doctor who performed Ballas's autopsy later came to a similar conclusion. Ballas also had an ear injury that appeared to come from pulling or tugging rather than from blunt trauma. No defensive wounds were found on her body, and no foreign DNA was found under her fingernails. Small pieces of gravel were found inside Ballas's labia, and several abrasions were found inside her vagina that, in the opinion of the doctor who conducted the sexual assault examination, were consistent with injuries often seen in women who have been forcibly penetrated. Saliva collected from a swab of one of Ballas's breasts matched Miranda-Guerrero's DNA. Despite treatment, she died after a few days from the severity of the swelling of her brain.

Miranda-Guerrero presented an alternative narrative that Ballas fell down and hit her head on the curb after urinating in the street. Police swabbed an area of the street around where Ballas was found for evidence. Part of a nearby gutter appeared damp in crime scene photographs, but that area was not swabbed. No urine was found on the swabs that were collected.

Over Miranda-Guerrero's motion to suppress, several hours of video from his interviews with police were played for the jury, including a portion of the interviews in which he told the officers that he had hit Ballas.

### b. Defense Case

As noted, the theory of Miranda-Guerrero's defense was that the brain injury that killed Ballas resulted from her falling and hitting her head on the curb because she was intoxicated. Defense counsel argued that Miranda-Guerrero had met Ballas after she left Jason's house and that he was walking with her

4

when she stopped to urinate between the two cars where she was found. After urinating, she stood up and fell over. Miranda-Guerrero conceded that he raped her after she was knocked unconscious by the fall.

Jason testified that Ballas seemed intoxicated when he met her on the night of November 26; he said her eyes were glassy and her eyelids were "a little droopy." But he said she did not fall down or seem unsteady on her feet during the time he was with her that evening. A criminalist who conducted an analysis of Ballas's blood the morning she was found testified that she likely had a blood-alcohol level of 0.15 to 0.19 grams percent around 2:30 a.m. on November 27. He testified that the degree to which this blood alcohol level would affect a person's gross motor skills depends on the individual.

An officer who arrived at the scene before Ballas was taken to the hospital testified that the ground underneath her pelvic area on the street appeared wet, and the wetness drained toward the gutter. He tried to smell the wet spot after Ballas was taken away, and he said it did not smell like urine. A palm print from Ballas's right hand was also found on the tailgate of the car parked immediately in front of where she was found. The fingers on the print were pointing nearly straight up, with the thumb facing the street.

The radiologist who conducted the CT scan of Ballas testified that her injuries could have been caused by a fall from full height if she hit her head on the curb without breaking her fall. He said the injuries would also be consistent with her head being slammed into the curb by an attacker. And he said he had only seen a fall cause injuries like Ballas's when the patient was geriatric or when the person fell from a height or the fall

occurred during activities like bicycling, skateboarding, or rollerblading.

According to an officer who interviewed Richard after Ballas was found, Richard stated that the voice he heard yelling early in the morning on November 27 might have been male.

### 3. May 2000 Attempted Carjacking of Heidi D.

On the night of May 25, 2000, Heidi D. went out with a few of her friends in downtown Huntington Beach. They returned around midnight to the parking garage where they had left their car. Miranda-Guerrero approached the group as they got to the car. He started talking to the women, but he was incoherent. He tried to grab the keys from Heidi, and they started fighting over the keys near the driver's side door. She eventually let Miranda-Guerrero take the keys, and he got into the car.

One of Heidi's friends went to the driver's side door and told Miranda-Guerrero to give her the keys. He grabbed her by the back of her head and pulled her into the car. This conduct was the basis of the additional assault charge on which the jury could not reach a verdict. Another of her friends opened the passenger door and started hitting Miranda-Guerrero and trying to get the keys out of the ignition. He hit her back with his elbow. Heidi and a third friend ran to a nearby bar to get help, and the other two friends soon got away and joined them. Miranda-Guerrero was gone by the time they all got back to the car.

### 4. May 2000 Assault on Deena L.

#### a. Prosecution Case

Deena L. testified that on the evening of May 25, 2000, she went with her boyfriend and a few friends to Gallagher's Bar in

downtown Huntington Beach. She stayed until shortly before midnight and then left to walk home. Her friends and boyfriend remained at the bar. This was within an hour of the attack on Heidi and her friends. Deena noticed that a man was following her as she walked home, and when she turned around to return to an area with more people, he ran and caught up to her. He grabbed her hair and put his other hand over her mouth, and he pushed her down onto the sidewalk. She bit his fingers to try to get him to release her.

At that point, the man started slamming Deena's head against a brick planter next to the sidewalk. She testified that he slammed her head against the planter four to six times. She started to lose consciousness, but she was able to get out of the man's grasp and hit him. He ran away at that point. Deena found a police officer in a coffee shop and told him what had happened. When she and the officer left the coffee shop, they spotted Miranda-Guerrero walking in a nearby alley, and he was arrested.

Deena identified Miranda-Guerrero as the man who had attacked her. DNA collected from under Deena's fingernails and between her teeth matched Miranda-Guerrero's.

### b. *Defense Case*

The defense theory was that the evidence was insufficient to show Miranda-Guerrero specifically intended to rape Deena when he attacked her.

A security worker at Gallagher's Bar testified that Miranda-Guerrero had come to the bar twice on the evening of May 25. The worker turned him away both times because he was too intoxicated. The first time Miranda-Guerrero came to

the bar was around 11:30 p.m.; the second time was around midnight, just before the assault on Deena.

### 5. Receiving Stolen Property

Christine J.'s car was broken into on September 1999 while parked in a parking structure in Huntington Beach. A purse and phone were taken. After Miranda-Guerrero was arrested, police obtained his backpack from the restaurant where he worked and found Christine's phone inside.

### B. Penalty Phase

The prosecutor's case in aggravation consisted of victim impact testimony from Ballas's parents and sisters. The prosecutor also discussed the facts of the other charged offenses and the circumstances of Ballas's death.

Miranda-Guerrero's case in mitigation consisted principally of testimony about his childhood in Mexico and testimony from five psychologists about his cognitive functioning. Miranda-Guerrero was one of eight children and grew up very poor. His father drank too much and abused Miranda-Guerrero's mother. Miranda-Guerrero started working at a restaurant when he was about eight years old and left school when he was eleven or twelve.

Around the time Miranda-Guerrero stopped attending school, he went to work with Hector Ortega, the son of the woman for whom he had been working at the restaurant. He and Ortega manufactured leather belts in a room in the home of Ortega's mother. Ortega testified that this process involved smearing glue onto the belts with their hands without gloves or masks in a room with no fans, and that they eventually made hundreds of belts per day. The glue had a strong odor, and they would get headaches as they worked with it.

Dr. Antonio Puente interviewed Miranda-Guerrero and administered a series of neuropsychological tests. He found that Miranda-Guerrero's IQ was around 70, in the bottom two percentiles of the population, which he characterized as falling into "the mild mental retardation range or borderline retardation range." He described Miranda-Guerrero as "highly compromised intellectually, somewhat compromised educationally, and in some ways challenged neuropsychologically as well."

Dr. Robert Owen evaluated Miranda-Guerrero and administered a test to assess whether he showed antisocial or psychopathic characteristics. Dr. Owen testified that Miranda-Guerrero showed a much lower degree of antisocial and psychopathic characteristics than the general population of men in the criminal justice system.

Dr. Ricardo Weinstein examined Miranda-Guerrero on three occasions and conducted a quantitative electroencephalogram (QEEG) analysis, a type of neurophysiological measurement. Dr. Weinstein testified that Miranda-Guerrero had an IQ between 75 and 82 and was functioning at the borderline of "what we consider mental retardation." He testified that Miranda-Guerrero's cognitive functioning is typically equivalent to that of a person between the ages of six and ten, but when he is intoxicated, that level of functioning may deteriorate further. Dr. Barry Sterman reviewed the QEEG data collected by Dr. Weinstein and testified that there was evidence of "significant brain disturbance," particularly in areas related to moral judgment and impulse control.

Finally, Dr. Mark Cunningham reviewed various records and reports but did not personally examine Miranda-Guerrero.

He testified that Miranda-Guerrero has developmental impairments and "distinct brain abnormalities" that "provide some physiological basis for judgment, emotional and behavior disturbances."

In addition to cross-examining the defense witnesses, the prosecutor called Dr. David Frecker, who described the QEEG test used by Dr. Weinstein and Dr. Sterman as "fraught with many problems" and said his practice did not use that test because they "find it to be unreliable." In closing argument, the prosecutor played parts of the videotape of Miranda-Guerrero's interviews with police and argued that his conduct during those interviews demonstrated that his cognitive capacities were greater than the doctors' evaluations had shown.

## II. GUILT PHASE ISSUES

### A. Admission of Statements to Police

Miranda-Guerrero challenges the admission at his trial of statements he made to police officers during three custodial interrogations, which collectively spanned 12 hours between May 26 and May 29, 2000. He argues that his statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and that they were involuntary in light of the totality of the circumstances. He expresses particular concern about the effect of admitting statements he made near the end of his second interview, in which he said he may have hit Bridgette Ballas "maybe two times." We find no error.

### 1. Facts

Miranda-Guerrero was arrested early in the morning on May 26, 2000, immediately after the attack on Deena. His first interview began about six hours later. He was interviewed by two detectives of the Huntington Beach Police Department,

10

Dave Dierking and Sam Lopez. Miranda-Guerrero's first question to the officers was whether they spoke Spanish. Early in the interview, before Miranda-Guerrero received his *Miranda* advisement, Dierking asked in which language he was more comfortable proceeding. Because his response — "maybe more I speak Spanish because maybe I don't understand everything" — indicated that his command of English was uncertain, Lopez served as translator for the remainder of the interrogation.

After some preliminary questions, the detectives asked Miranda-Guerrero how long he had been in the United States. He said he had been in the country two or three years. Lopez then gave him an advisement as to his *Miranda* rights. The full transcript of the advisement is reproduced below as it appeared in the exhibits used at Miranda-Guerrero's trial. The statements in brackets are translations included in the superior court's exhibit that it used to evaluate whether Miranda-Guerrero's statements should be suppressed.

> "[LOPEZ]: Okay. *Lo voy hacer dos modos, Ingles y Espanol*, okay? You have the right to remain silent. *Entiendes eso?* [Do you understand that?]
>
> "[MIRANDA-GUERRERO]: Of course.
>
> "[LOPEZ]: Anything you say may be used against you in court. *Entiendes eso?*
>
> "[MIRANDA-GUERRERO]: *Si, si antes estaba en la corte?* [If, if I was in court before?]
>
> "[LOPEZ]: *Todo que usted me dice, lo puedo usar en corte contra used* [*sic*]. [Everything that you say may be used in court against you.]
>
> "[MIRANDA-GUERRERO]: Yeah.

"[LOPEZ]: Okay, *primero Ingles y entonces Espanol*, okay? [[F]irst English and then Spanish.] *Usted tiene el derecho . . . usted tiene el derecho*, uh . . . [You have the right . . . you have the right, uh . . .] or, or you have the right to remain silent. Anything you say may be used against you in court. You have the right to the presence of an attorney before and during any questioning. If you cannot afford an attorney, one will be appointed for you free of charge before any questioning if you want.

"*De primero. Usted tiene el derecho para meser* [*sic*] *silencio.* [First of all, you have the right to remain silent.] *Usted no tienes que decir nada si quieres. Entiendes eso? Porque aqi* [*sic*] *en este los Estados Unidos tene* [*sic*] *derechos. Todo que usted me dice, lo puedo user . . . usar en corte contra used* [*sic*]. *Entiendes eso?* [You do not have to say anything if you want. Do you understand that? Because here in the United States you have rights. Everything that you tell me can be used, used in court against you. Do you understand that?] Okay.

"*Usted tiene el derecho a tener un abogado. Y si no tienes dinero para un abogado, el corte de* [*sic*] *da uno gratris* [*sic*] *de costa. Entiendes eso?* Eh, eh . . . *usted tiene el derecho obtener un abogado durante unos . . . unas preguntas. Entiendes eso? Si o no? Digame si.* [You have the right to have an attorney. If you do not have money for an attorney, the court will provide one free of charge. Do you understand that? Eh, eh . . . you have the right to obtain an attorney

12

during the, the questions. Do you understand? Yes or no? Tell me . . . yes.]

"[MIRANDA-GUERRERO]: Mm hm.

"[LOPEZ]: Okay, *porque es importante* [because it's important].

"[DIERKING]: Just so I know, I speak a little, is that a *si* or *no*?

"[MIRANDA-GUERRERO]: Yeah.

"[LOPEZ]: *Si. Si no tienes dinero por un abogado, el corte te da una gratis de costa. Entiendes eso? El corte te da uno. Entiendes eso?* [If you do not have money for an attorney, the court will give you one free of charge. Do you understand that? The court will give you one. Do you understand that?]

"[MIRANDA-GUERRERO]: Mm hm.

"[LOPEZ]: *Entonces con estos derechos en mento, quieres hablar con nosotros . . . sobre los cargos?* [Then, with these rights in mind, do you want to talk with us . . . about the charges?]

"[MIRANDA-GUERRERO]: *Pues no se . . . como de que?* [Well, I don't know . . . like about what?]

"[LOPEZ]: *Si o no? Quires* [*sic*] *hablar sobre los cargos? Quires* [*sic*] *hablar con nosotros?* [Yes or no? Do you want to talk about the charges? Do you want to talk with us?]

"[MIRANDA-GUERRERO]: *Pues si pe —* [Well yes, bu —]

"[LOPEZ]: Okay.

"[DIERKING]: Okay, do you understand those? Okay? Now you, you sorta indicated that you were just walking?"

13

The interview proceeded for about two hours without further advisement. As the parties agreed during the superior court's hearing on Miranda-Guerrero's suppression motion, the officers did not inform him of any rights he may have had under the Vienna Convention on Consular Relations, and "the subject of consular consultations did not come up."

Miranda-Guerrero's second interview began when Dierking and Lopez woke him up shortly after midnight that evening. At the start of the interview, Lopez asked Miranda-Guerrero the following question: *"Te acuerdas cuando hablamos de los derechos? Que tienes . . . permanecer silencio y todo eso."* The superior court's exhibit indicates that Lopez's Spanish was deficient, but it translates his question as "Do you remember when we talked about the rights? That you have . . . to remain silent and all that." Miranda-Guerrero replied "Um-hmm." Lopez then asked in Spanish if Miranda-Guerrero wanted to talk to them again with those rights in mind. He said yes, and the interview proceeded.

The third interview was conducted two days later. At the beginning of the interview, Lopez read Miranda-Guerrero's rights to him from a card on which they were correctly translated into Spanish. He had Miranda-Guerrero read the card as well.

Although various statements Miranda-Guerrero made during his interviews were introduced at trial, the most incriminating statement regarding his murder charge came during the second interrogation. Miranda-Guerrero's explanation of the circumstances of Ballas's death changed over the course of his interviews. He claimed at first that he had never seen Ballas, then that he was walking with her on the night she died but that he left before she was hurt, and

eventually that she fell and hit her head, the position he maintained at trial. At the end of his second interview, which spanned more than seven hours, he told the officers that he may have hit Ballas twice. On further questioning, he said he could not recall any other details with certainty. Asked when he hit her, he said, "Maybe when she had fallen down . . . . Maybe . . . maybe that's when maybe I . . . when maybe I hit her. Because I hadn't remember [*sic*] that I had hit her." Asked if he now remembered hitting her, he responded, "Well . . . you're saying (I did). But I . . . . Really, I . . . . Well, I haven't remembered, but . . . but like, like, you'd say that (. . . ?) . . . no, no, no." When the officers asked again if he remembered hitting Ballas, he responded, "No man. But if I hit her maybe it was two. But no, I don't remember."

About three hours of video from the interviews were played during the trial. The prosecutor discussed Miranda-Guerrero's statements and changing story, emphasizing them particularly in rebuttal to the defense's closing argument. As he told the jury, "[i]t took hours and hours and hours of questions. . . . He didn't admit anything." The prosecutor pointed out that the first thing Miranda-Guerrero said when asked if he knew what had happened to Ballas, at a time when he was still denying that he had ever seen her, was "[p]erhaps she was killed." "What innocent person in the position of the defendant would ever say that?" he asked. "He repeatedly tells the police he never saw her fall," the prosecutor said. "And then only four hours into the second interview, six hours total, he finally tells the police the truth. And he tells the police, perhaps he hit her twice."

### 2. Miranda *Analysis*

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of the custodial setting (*Miranda*, *supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise a suspect of his right to remain silent and to have counsel present prior to any custodial interrogation (*id.* at pp. 444–445). "A suspect who has heard and understood these rights may waive them," but the prosecutor " 'bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances.' " (*People v. Leon* (2020) 8 Cal.5th 831, 843 (*Leon*).) "The totality approach permits — indeed, it mandates — inquiry into all the circumstances surrounding the interrogation," including the defendant's "age, experience, education, background, and intelligence," and "whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." (*Fare v. Michael C.* (1979) 442 U.S. 707, 725.)

"A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.) When evaluating the admissibility of a defendant's statements on appeal, we accept the trial court's resolution of disputed facts if supported by substantial evidence, and we independently determine from the undisputed facts and the facts properly found by the trial court whether the statements were illegally obtained. (*Ibid.*) Miranda-Guerrero challenges the adequacy of the *Miranda*

advisory and waiver only with respect to the first two of his three interviews, although he also challenges the voluntariness of his statements from the third interview.

Miranda-Guerrero did not argue before the trial court that his *Miranda* rights were violated due to a lack of English comprehension.  But the record raises some question about whether his English fluency was adequate for him to understand his rights when he was advised of them in English.  His response to the warning that what he said could be used against him — "if, if I was in court before?" — indicated that he did not grasp that relatively straightforward admonition.  At several points, he struggled with questions put to him in English, for instance responding "Uh, it's where?" when asked with whom he lived, and answering "My brother?" when asked if he had ever had problems with women.  When Dierking thanked him for cooperating with the officers during the first interview and said that the case would be given to the district attorney, Miranda-Guerrero admitted to Lopez that he didn't understand what Dierking had said.  When asked where he first saw Deena L., he answered, "Oh because, because she's angry and because she said it."  At some points, however, Miranda-Guerrero did respond appropriately and was able to ask clarifying questions.

We need not decide whether the *Miranda* advisement given in English was sufficient.  Recognizing the language barrier, Lopez advised Miranda-Guerrero in Spanish as well.  Some translation difficulties made the Spanish advisement suboptimal; it is not clear why the officers, who had access to a printed card with properly translated *Miranda* advisements, chose to advise Miranda-Guerrero at the first interview with a Spanish translation developed on the fly.  However, we conclude

17

that under the totality of the circumstances, the Spanish admonition adequately informed Miranda-Guerrero of his rights.

As to the right to remain silent and the right to court appointment of counsel, Lopez's Spanish advisement was sufficient. He explained that Miranda-Guerrero had the right to silence, that he did not have to say anything if he did not want to, and that whatever he said could be used against him. He instructed Miranda-Guerrero twice that he had the right to a court-appointed attorney if he could not pay for counsel, and he took steps to phrase the right in clear and simple terms.

It is a closer question whether Lopez adequately advised Miranda-Guerrero of his right to consult with an attorney prior to his interrogation and to have an attorney present throughout the interview. *Miranda* admonitions require no "talismanic incantation," but they must contain each of the mandatory warnings, either as the high court set them out in *Miranda* itself or by some " '*fully effective equivalent.*' " (*California v. Prysock* (1981) 453 U.S. 355, 359–360 (*per curiam*), quoting *Miranda*, *supra*, 384 U.S. at p. 476.) Notifying a suspect that he or she has the right to a court-appointed attorney without explaining that this includes the right to have an attorney present before and during any custodial interviews is an insufficient admonition. (*Duckworth v. Eagan* (1989) 492 U.S. 195, 205.)

According to the translation in the superior court's exhibit, Lopez instructed Miranda-Guerrero that "you have the right to obtain an attorney during the, the questions." He did not specify which "questions" he was referring to, and nothing else in the advisement explained that Miranda-Guerrero's right to an attorney applied not just during court proceedings, but before and during any interrogation. Nor did Lopez take any steps to

clarify the ambiguous admonition, instead immediately asking Miranda-Guerrero to declare whether he understood the right.

In context, however, it would be reasonable for a suspect in Miranda-Guerrero's position to presume that "the questions" to which Lopez referred were the questions that the detectives were about to ask him. And while Miranda-Guerrero may not have understood every aspect of the *Miranda* advisement he was given in English, the full and accurate recitation of his rights in English may have helped clarify any ambiguity about what questions Lopez was referencing in the Spanish admonition. Perhaps most significantly, Miranda-Guerrero agreed at the beginning of the third interview that the rights he was advised of then — which included the right to have counsel present, explained multiple times and in accurate Spanish — were the same as the rights the detectives had discussed with him during the first interview. Considering the totality of the circumstances, we conclude that the admonition at the first interview was adequate to advise Miranda-Guerrero of his right to the presence of an attorney during the interrogation.

Miranda-Guerrero argues that even if he was adequately advised of his rights, he did not understand or waive them. He says he did not understand his rights because his initial response when asked if he understood them was "Mm hm" rather than something more affirmative. But when advised of his rights at the third interview, Miranda-Guerrero clearly indicated not only that he understood his rights, but that they were the same rights of which he had been advised at the first interview. Miranda-Guerrero similarly says he did not waive his rights because his initial response when asked if he wanted to talk to the detectives was "*Pues si pe* —," which the court's transcript translates as "Well yes, bu —." But he proceeded

19

immediately to speak with the officers, answered their questions without hesitation, and said nothing " 'that could be construed as an invocation of his' " *Miranda* rights. (*People v. Flores* (2020) 9 Cal.5th 371, 417.) Under these circumstances, we cannot conclude that his initial answers when asked at the first interview if he wanted to talk, standing alone, are sufficient to show he did not understand or waive his rights. (See *ibid.* [" 'A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her Miranda rights has itself been held sufficient to constitute an implied waiver of such rights.' "].)

Miranda-Guerrero also argues that the totality of the circumstances suggests he did not knowingly and intelligently waive his rights, notwithstanding the proper advisement, because of his relative youth and limited education, his lack of experience with the American legal system, and his difficulty understanding English. As noted, he also claims he did not sufficiently express to the officers that he understood his rights because he answered "Mm hm" rather than something more affirmative when first asked whether he understood the advisement at his initial interview.

Miranda-Guerrero was 22 years old at the time of his police interviews, and he had left school when he was eleven or twelve. In *Leon*, we upheld the waiver of a defendant of similar age who had failed sixth grade, "consistently performed in the borderline range on intelligence tests," whose "knowledge of the legal system came mainly from Mexican soap operas," and who answered " 'uhm-hm' " when first asked if he understood his rights. (*Leon, supra,* 8 Cal.5th at pp. 840–841.) Certain aspects of the record in *Leon* were more indicative of a knowing and intelligent waiver than the evidence before us here. In

20

particular, the Spanish advisement in that case was given from a pre-printed form, and the interviewer, a native Spanish speaker, took care to give the advisement in a Spanish dialect with which the defendant was familiar. (*Id.* at p. 840.) But there are additional, affirmative indications in this case that Miranda-Guerrero understood the advisement he was given. Most notably, Miranda-Guerrero made clear at the start of the third interview that his understanding of the rights Lopez read him then from an accurately translated Spanish-language form was the same as his understanding from the first interview. We conclude that under these circumstances Miranda-Guerrero's waiver at the first interview was knowing and intelligent.

The Attorney General does not dispute that Miranda-Guerrero was not fully advised of his rights at the beginning of the second interview; the sole admonition provided was the question, in what the translator termed deficient Spanish, "Do you remember when we talked about the rights? That you have . . . to remain silent and all that." However, no readvisement was required.

Readvisement is not necessary following a valid admonition and waiver when the "subsequent interrogation is reasonably contemporaneous." (*People v. Spencer* (2018) 5 Cal.5th 642, 668.) "In determining whether a subsequent interrogation is reasonably contemporaneous, we consider the totality of the circumstances. Relevant considerations include: '1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that the defendant

subjectively understands and waives his rights.' " (*Ibid.*, quoting *People v. Smith* (2007) 40 Cal.4th 483, 504.)

We have held that interrogations taking place as long as 40 hours after a *Miranda* warning and waiver do not require readvisement when conducted by the same officers in the same location with an experienced defendant who "evinced no reluctance to be interviewed." (*People v. Williams* (2010) 49 Cal.4th 405, 434–435.) Miranda-Guerrero did not have experience with the criminal justice system at the time of his interviews, and he expressed some hesitation about proceeding when he was advised of his *Miranda* rights at the first interview. But his second interview took place fourteen hours after the first interview, in the same location and with the same detectives. He was also reminded, albeit briefly, of the original *Miranda* admonition at the beginning of the second interview. Considering all of the circumstances, we conclude that no readvisement was required at the second interview.

### 3. *Voluntariness Analysis*

Miranda-Guerrero also argues that his statements to officers were involuntary because the officers' methods were coercive, because he was not advised of his consular rights under the Vienna Convention, and because of his personal characteristics, including his limited education, inexperience with the criminal justice system, and lack of English proficiency. Under our precedents, his confession was not involuntary.

Involuntary statements to police are inadmissible for all purposes. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1193.) Statements are involuntary when they are not the product of " 'a rational intellect and free will.' " (*People v. Maury* (2003) 30 Cal.4th 342, 404, quoting *Mincey v. Arizona* (1978) 437 U.S. 385,

398.) To use a defendant's statements to police at trial, the prosecutor must prove by a preponderance of the evidence that they were voluntary. (*People v. Peoples* (2016) 62 Cal.4th 718, 740 (*Peoples*).) On appeal, the voluntariness of the statements "is reviewed independently in light of the record in its entirety, including 'all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.'" (*People v. Benson* (1990) 52 Cal.3d 754, 779.) We "'"examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden."'" (*Maury*, at p. 404.) When testimony in the record is conflicting, we "'"must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.'"'" (*Ibid.*)

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'. . . ." (*Colorado v. Connelly* (1986) 479 U.S. 157, 167.) Coercion is not limited to physical abuse; it may involve "more subtle forms of psychological persuasion." (*Id.* at p. 164.) These techniques include "'repeated suggestion and prolonged interrogation.'" (*People v. Hogan* (1982) 31 Cal.3d 815, 843, disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771.) They also include deprivation of sleep and food (*Greenwald v. Wisconsin* (1968) 390 U.S. 519, 521 (*per curiam*)), as well as "deception or communication of false information" (*Hogan*, at p. 840).

If coercive police conduct is present, we evaluate the totality of the circumstances to determine whether a defendant's statements were freely given. (*People v. Maury, supra*, 30 Cal.4th at p. 404.) Factors that we consider include the coercion discussed above, as well as "the length of the interrogation and

its location and continuity, and the defendant's maturity, education, and physical and mental health." (*Peoples*, *supra*, 62 Cal.4th at p. 740.) A defendant's "inexperience" and "low intelligence" may weigh against a finding of voluntariness, as do "deprivation and isolation imposed on [the] defendant during his confinement." (*People v. Neal* (2003) 31 Cal.4th 63, 68.)

Miranda-Guerrero asserts that several circumstances of the second interview raise concerns about the voluntariness of his confession at the end of that interview. The officers began interviewing him just after midnight, and the interrogation continued for more than seven hours until Miranda-Guerrero said he might have hit Ballas twice. Miranda-Guerrero notes that he "showed some signs of fatigue" (*Peoples, supra*, 62 Cal.4th at p. 741), telling the detectives at one point that he was "very sleepy." Further, the officers repeatedly emphasized Miranda-Guerrero's isolation and referred to the absence of any relationships in Miranda-Guerrero's life and the distance from his family as reasons why he might have attacked Ballas. In repeated accusations over the course of the night, the officers asserted dozens of times that he "beat," "hit," or "punched" Ballas.

While these aspects of the second interrogation of Miranda-Guerrero are relevant, they ultimately do not distinguish this case from prior cases in which we have declined to find involuntary a confession given in response to overnight questioning. In *Peoples*, for instance, we affirmed a finding of voluntariness in a case involving a twelve-hour overnight interview in which the police questioned the defendant "constantly for the first 10 hours of the interview." (*Peoples*, *supra*, 62 Cal.4th at p. 739.) An expert testified in that case that "the detectives used coercive techniques . . . over 50 times

during the 12-hour interrogation." (*Id.* at p. 740.) The interview in *Peoples* was both longer and more coercive than Miranda-Guerrero's second interview. Moreover, as in *Peoples*, Miranda-Guerrero "was given numerous breaks, drinks, and food," and the officers "never offered him leniency for his confession and never threatened a harsher penalty if he remained silent." (*Id.* at p. 741.) The defendant in *Peoples* also showed considerably greater signs of exhaustion than Miranda-Guerrero — "sweating, pulling out his hair, rubbing his skin, twitching his facial muscles, grinding his teeth, and at times appearing to fall asleep." (*Id.* at p. 739.)

Miranda-Guerrero says his confession was nevertheless involuntary because the detectives did not advise him of his right under Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (Article 36) to have the Mexican consulate notified of his detention, even though the detectives became aware early in the interviews that he was likely not a citizen of the United States. Although the failure to notify a suspect of his or her consular rights does not by itself require suppression of the suspect's statements, this court and the United States Supreme Court have recognized that "[a] consular notification claim may be raised as part of a broader challenge to the voluntariness of a confession." (*Leon*, *supra*, 8 Cal.5th at p. 846, citing *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 350.) But "[i]n most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." (*Sanchez-Llamas*, at p. 349.) Miranda-Guerrero says he would have invoked his *Miranda* rights to counsel and to remain silent if he had been advised of his consular rights or received consular assistance. But this argument is too speculative given the

25

record in this case. (See *Leon*, *supra*, 8 Cal.5th at p. 847; *People v. Vargas* (2020) 9 Cal.5th 793, 833.) Considering the totality of the circumstances and our independent review of the video of Miranda-Guerrero's interrogation, we cannot conclude that his confession during his second custodial interview was involuntary.

Furthermore, the first and third interviews exhibited few of the troubling features of the second interview. The first interview took place at 8:00 a.m. and lasted just over two hours. The third took place several days later at 10:00 a.m. and also lasted only a few hours. The questioning during the first interview was not aggressive or coercive, and while there were periods of insistent questioning in the third interview, they were relatively brief. We therefore conclude that Miranda-Guerrero's statements from the first and third interviews were voluntarily given as well.

## B. Consular Notification

Miranda-Guerrero seeks a "comprehensive judicial 'review and reconsideration' of his conviction and sentence" because of the interviewing officers' failure to inform him of his right to the assistance of the Mexican consulate under Article 36. This review, he says, must " 'examine the facts' " of the conviction and sentence, "and in particular the prejudice" resulting from the violation of the convention. He claims this entitlement flows from the decision of the International Court of Justice in *Avena and Other Mexican Nationals* (*Mexico v. U.S.*) 2004 I.C.J. 12 (judg. of Mar. 31) (*Avena*), in which the court instructed that such review and reconsideration would be the appropriate remedy for violations of foreign nationals' consular rights. (*Id.* at pp. 59–60, ¶¶ 121–122.)

California codified the requirements of Article 36 in Penal Code section 834c. (*Leon, supra,* 8 Cal.5th at p. 845.) In *Leon,* we assumed without deciding that the rights found in Article 36 and section 834c are individually enforceable (*Leon,* at p. 846), and we do so here as well. But even if Miranda-Guerrero is authorized to enforce Article 36 and entitled to the remedy described in *Avena,* we have already found that he has not shown prejudice on this record from the violation of his consular rights. Any matters outside the record suggesting that Miranda-Guerrero was prejudiced may be raised in a petition for habeas corpus; we express no view here on the validity of such a claim. (See *In re Carpenter* (1995) 9 Cal.4th 634, 646 [review on direct appeal "is limited to the four corners of the record on appeal"].)

## C. Denial of Presence at Certain Proceedings

Miranda-Guerrero claims he was prejudicially denied his constitutional and statutory rights to be present during five trial proceedings: (1) a meeting on juror misconduct; (2) discussions regarding spectator misconduct; (3) a meeting concerning the portions of his police interview to be played at trial; (4) a conference on jury instructions; and (5) a proceeding regarding a response to a jury question. We disagree.

A criminal defendant has both constitutional and statutory rights to be present at certain trial proceedings. (*People v. Cole* (2004) 33 Cal.4th 1158, 1230.) "The federal Constitution provides a defendant the right to be present if ' "(1) the proceeding is critical to the outcome of the case, and (2) the defendant's presence would contribute to the fairness of the proceeding," ' " and the state constitutional right is largely equivalent. (*People v. Caro* (2019) 7 Cal.5th 463, 478–479; see

*People v. Harris* (2008) 43 Cal.4th 1269, 1306.) The statutory right is coextensive with the state constitutional right but can only be waived in writing. (*Cole*, at p. 1231; *People v. Wall* (2017) 3 Cal.5th 1048, 1060.)

Miranda-Guerrero claims that his absence from the five proceedings constitutes structural error, but we have said that "[e]rroneous exclusion of the defendant is . . . trial error that is reversible only if the defendant proves prejudice." (*People v. Perry* (2006) 38 Cal.4th 302, 312.)

### 1. *Meeting on Potential Juror Misconduct*

Between the guilt and penalty phases, the court informed the parties, in Miranda-Guerrero's presence, that Juror No. 11 had told the bailiff that Juror No. 1 called her spouse after the verdict was reached. The following afternoon in chambers, in Miranda-Guerrero's absence and without a waiver, the parties indicated it was unnecessary to question the jurors.

Miranda-Guerrero had no right to be present at the in-chambers meeting. In *Harris*, we held that "[t]he dismissal of a juror for misconduct is not a matter for which the defendant must be present." (*People v. Harris*, *supra*, 43 Cal.4th at p. 1309.) Deciding whether to investigate misconduct cannot be said to be more " ' "critical to the outcome of the case" ' " than deciding whether to dismiss a juror for misconduct. (*People v. Caro*, *supra*, 7 Cal.5th at pp. 478–479.) Miranda-Guerrero claims that he may "have perceived something about Juror No. 1" that warranted investigation or dismissal. But we have rejected similarly speculative theories about how a defendant "could have contributed to the fairness of the proceedings." (*Harris*, at p. 1307.) Moreover, any error was not prejudicial. Miranda-Guerrero was present when the court first announced

the Juror No. 1 issue and was aware that his counsel was given an option to request further investigation. He had ample opportunity to raise any concerns he may have had about Juror No. 1. "[N]othing in the record indicates" that Miranda-Guerrero's presence at the in-chambers meeting would have led to further inquiry or dismissal of the juror. (*Caro*, at p. 479.)

### 2. *Meetings on Spectator Misconduct*

During the trial, the parties and the court met in chambers twice without Miranda-Guerrero to discuss spectator misconduct. It was decided at the first meeting that the court would give a general admonition, and at the second meeting it was determined that the court would individually admonish an audience member. Miranda-Guerrero did not have a constitutional or statutory right to be present at either proceeding because they involved discussions on spectator misconduct and admonitions, which are "routine procedural discussions on matters that do not affect the outcome of the trial." (*People v. Perry, supra*, 38 Cal.4th at p. 312.) Conducting the meetings on spectator misconduct without Miranda-Guerrero present was not error.

### 3. *Conference on Interview Excerpts To Be Played at Trial*

After the court ruled on the admissibility of Miranda-Guerrero's police interview in his presence, the prosecutor indicated that the parties were going to work together to select which portions would be played to the jury. The parties agreed on the selected portions and informed the court of their agreement at an in-chambers meeting the following afternoon without Miranda-Guerrero present. The parties and the court

then discussed the timeline and process for verifying and playing the tapes to the jury.

In *People v. Davis* (2005) 36 Cal.4th 510, we held that a defendant had both a statutory and constitutional right to be present at a "hearing during which the contents of [a] jailhouse tape were discussed and agreed upon" because the defendant "could have assisted his attorneys in deciphering the tape" since he was present when it was made. (*Id.* at p. 531.) Miranda-Guerrero argues he had a right to be present because, as in *Davis*, he was "most familiar with the contents of the statements" in the tape and therefore could have "assisted his attorneys" in selecting the excerpts. But unlike in *Davis*, the court here had already ruled on the admissibility of the tapes, and the determination of which excerpts would be played was made by counsel before the in-chambers meeting. Accordingly, Miranda-Guerrero's presence at the meeting could not have " ' "contribute[d] to the fairness of the proceeding." ' " (*People v. Caro, supra*, 7 Cal.5th at p. 479.) Nor is it clear how a meeting discussing the logistics of playing preapproved portions of the tape could have been " 'critical to the outcome of the case.' " (*Id.* at pp. 478–479.)

In any event, no substantive decisions on the admissibility of the tape or its selected excerpts were made during the meeting. Miranda-Guerrero has not shown how excluding him from this logistical discussion could have " ' "prejudiced his case or denied him a fair and impartial trial." ' " (*People v. Caro, supra*, 7 Cal.5th at p. 479.) Any error in excluding him was not prejudicial.

### 4. *Conference on Jury Instructions*

At the end of the guilt phase, in Miranda-Guerrero's absence, the court discussed with counsel the jury instructions for lesser included offenses. We have repeatedly held that defendants "may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding." (*People v. Perry*, *supra*, 38 Cal.4th at p. 312.) These include "conference[s] on jury instructions." (*Ibid.*) Excluding Miranda-Guerrero from this conference was not error.

### 5. *Meeting on Response to Jury Question*

During jury deliberations at the guilt phase, the court and parties met to discuss jury questions with Miranda-Guerrero absent. The court read out the jury's latest question: "When establishing intent in a count, may we take into consideration established and agreed upon intents in other counts?" The court directed counsel to meet and confer about a proposed response. When the court reconvened, still without Miranda-Guerrero present, the court and parties settled on redirecting the jury to several CALJIC instructions.

In *People v. Jennings* (2010) 50 Cal.4th 616, 682, we held that a defendant "did not have a constitutional or statutory right to be personally present during the in-chambers discussion regarding how to respond to [a] jury's question" about an issue of law. This is because "[t]he formulation of an appropriate response to this question was a legal matter," and "a defendant does not have the right to be personally present during proceedings, held in-chambers and outside of the jury's presence, concerning questions of law." (*Ibid.*)

Miranda-Guerrero claims *Jennings* is distinguishable because "the question and proposed response" in *Jennings* "were read in defendant's presence." But that is a distinction without a difference; our holding in *Jennings* turned on the fact that the jury's question and the response to it involved legal issues. (*People v. Jennings*, *supra*, 50 Cal.4th at p. 682.) As in *Jennings*, "[t]he formulation of an appropriate response" to the jury's intent question here was a legal matter. (*Ibid*.) Accordingly, Miranda-Guerrero did not have a constitutional or statutory right to be present at the proceeding.

### D.  Juror Misconduct

Miranda-Guerrero claims that his conviction must be reversed because the trial court failed to discharge one of the jurors for misconduct and failed to hold a hearing into the juror's ability to serve after a suggestion of misconduct was raised. Even assuming the juror's actions were misconduct, Miranda-Guerrero was not prejudiced.

As noted, after the jury reached its guilt phase verdict but before the verdict was announced, Juror No. 1 informed her spouse on a phone call that she would be done later than expected. She also told her spouse that the jury had reached a verdict. The jury foreperson informed the bailiff of this call, the bailiff informed the court, and the court informed the parties. It was not clear whether Juror No. 1 told her spouse what the verdict was, but the court instructed the parties to assume she had for the purposes of deciding what to do about the issue.

In the court's view, the actions of Juror No. 1 did not constitute misconduct. Its position was that there was no need to discuss the issue further with the jury foreperson who reported the conversation, but it deferred to the parties about

whether to pursue further inquiry either with the foreperson or with Juror No. 1. After considering the issue, the parties advised the court that they did not believe there was need for further inquiry.

"It is misconduct for a juror during the course of trial to discuss the case with a nonjuror." (*People v. Danks* (2004) 32 Cal.4th 269, 304.) Juror misconduct raises a "presumption of prejudice," but that presumption is rebutted when the reviewing court determines, based on the record as a whole, that " ' "there is no substantial likelihood that the complaining party suffered actual harm." ' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1309.)

The jurors in this case were admonished not to talk about the proceedings with anyone outside the jury. Assuming without deciding that Juror No. 1 committed misconduct when she told her spouse that a verdict had been reached, no prejudice flowed from her actions. Juror No. 1 told her spouse that she would be done late, that a verdict had been reached, and possibly what the verdict was. There is no reasonable probability that conveying this information to her spouse biased Juror No. 1 against Miranda-Guerrero or made her incapable of serving as a penalty phase juror. (See *People v. Harris*, *supra*, 43 Cal.4th at p. 1303.) Miranda-Guerrero also argues that the trial court erred by declining to hold a hearing to inquire further into the juror's alleged misconduct. But " ' " [a] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties . . . .' " ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 506.) The trial court assumed that Juror No. 1 told her spouse what verdict the jury had reached and properly concluded that Miranda-Guerrero was not harmed even under

those circumstances. It was not required to hold a hearing to further investigate the juror's actions.

### E. Motion for a New Trial

Shortly after the trial concluded, a newspaper article was published detailing various lawsuits and disciplinary actions against one of the prosecutor's medical experts, Dr. Israel Chambi, who was the medical witness most skeptical of Miranda-Guerrero's theory that a fall caused Ballas's injury. Miranda-Guerrero moved for a new trial, arguing that the article constituted new evidence "that could have affected the outcome of both the guilt and penalty phase of the trial." The court denied his motion.

Miranda-Guerrero asks that we remand the matter for the superior court to reconsider its ruling on the motion for a new trial in light of additional evidence he presents here in a request for judicial notice. This evidence consists of two unpublished Court of Appeal opinions from 2002 in suits against Dr. Chambi, which he says substantiate "several of the incidents documented in the newspaper article." We take judicial notice of the existence of the opinions but not the statements of fact contained therein. (See *People v. Woodell* (1998) 17 Cal.4th 448, 455.)

Under Penal Code section 1181, a new trial is warranted "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (Pen. Code, § 1181, subd. 8.) " ' "To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." [Citation.] "[T]he trial court has broad discretion in ruling on a new trial motion . . . ," and its "ruling

will be disturbed only for clear abuse of that discretion." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 667.)

Miranda-Guerrero is not entitled to a remand for a further hearing on his new trial motion. He does not claim that the trial court abused its discretion in denying the motion based on the evidence before the court at the time. And our review on direct appeal "is limited to the four corners of the record on appeal." (*In re Carpenter, supra,* 9 Cal.4th at p. 646.) We decline to remand on the basis of evidence not presented to the trial court.

Nor in any event would the outcome be different on remand as a result of the Court of Appeal opinions he presents in his request for judicial notice. Those opinions were available when the trial took place. They would not be an appropriate basis for a new trial because Miranda-Guerrero could, "with reasonable diligence, have discovered and produced" them at his original trial. (Pen. Code, § 1181, subd. 8.)

Miranda-Guerrero also contends that the due process principles expressed in *Brady v. Maryland* (1963) 373 U.S. 83 required the prosecutor "to investigate the credibility" of Dr. Chambi before calling him as "a critical expert witness." He does not claim a *Brady* violation, but he suggests that the prosecutor's failure to investigate supports his request for remand to reconsider his new trial motion.

We are not persuaded by Miranda-Guerrero's claim that he is entitled to reconsideration of his new trial motion because of the prosecutor's failure to investigate Dr. Chambi. He argues that if the prosecutor had investigated Dr. Chambi's credibility, the prosecutor "would have found" the Court of Appeal opinions that Miranda-Guerrero presents in his request for judicial notice. Again, these opinions would not have supported his new trial motion because they were available at the time of the trial.

(See Pen. Code, § 1181, subd. 8.)  He further suggests that the prosecutor's investigation might have revealed "information at the Medical Board of California about the professional status of its witness, Dr. Chambi."  But he does not provide any such records, nor does he claim that the prosecutor's failure to uncover this information violated *Brady* or that there is a *Brady*-based duty to investigate witness credibility.

In sum, Miranda-Guerrero does not argue that the court abused its discretion in denying that motion on the basis of the record before it, and he has not demonstrated that the evidence he now proffers to support his new trial motion was unavailable at the time of trial.  In light of the limited scope of our review of a trial court's decision to deny a new trial motion, Miranda-Guerrero is not entitled to a remand for further proceedings on his motion.

Finally, Miranda-Guerrero argues in passing that the fact that the impeachment evidence against Dr. Chambi was not introduced at trial made the proceedings "fundamentally unfair and violated appellant's rights to due process, to confront and cross-examine witnesses, to the effective assistance of counsel and to a reliable penalty determination."  Again, he does not claim a *Brady* violation, nor does he claim that the trial court improperly limited his impeachment of Dr. Chambi.  In the absence of argument to support these constitutional claims, we conclude they supply no basis for relief.

## F.  Prosecutorial Misconduct

Miranda-Guerrero claims that two groups of statements made by the prosecutor constituted misconduct and deprived him of a fair trial:  comments about the police investigation,

which Miranda-Guerrero claims amounted to improper vouching, and derogatory comments directed at defense counsel.

During opening and closing argument, the prosecutor mentioned the quality of the work of the police officers who investigated Miranda-Guerrero's case. At the time these statements were made, Miranda-Guerrero did not clearly object or ask for a jury admonition. Midway through the prosecutor's closing argument, after almost all of these statements had occurred, defense counsel asked to speak with the court and prosecutor outside the presence of the jury and expressed concern that "we're getting into the area of improper personal vouching for the police department." Counsel noted that the defense had "not objected this far, but I think we're getting a little bit astray." Counsel's statement was insufficient to preserve a claim of prosecutorial misconduct. The defendant must generally object "in a timely fashion — and on the same ground," and must "request[] that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Because defense counsel did neither, Miranda-Guerrero has forfeited this claim.

Miranda-Guerrero also argues that his trial was tainted by two parts of the prosecutor's closing argument in which he discussed defense counsel's conduct: questions about why defense counsel had elicited evidence regarding Ballas's liver and a kiss she shared with Jason on the night in question, and statements that an argument made by defense counsel was " 'intellectually dishonest' " and " 'an insult' " to the jury's intelligence. The questions about the defense's evidence immediately prompted the sidebar at which defense counsel mentioned concerns about vouching. Before raising the issue of improper vouching, counsel expressed concern that the

prosecutor had been "insinuati[ng] that the defense is doing something underhanded." Defense counsel further expressed that the prosecutor's comments could not "go any further without running some serious risks in the case in terms of potential misconduct." After the prosecutor said he did not intend to go further, the court told the attorneys that it had "not noted any error by the district attorney."

Later in the prosecutor's argument, defense counsel objected to the statement that part of the defense's argument had been "intellectually dishonest," though counsel did not reiterate that objection when the prosecutor subsequently said the argument was insulting to the jury. Counsel did not state the basis for the objection, and in context it is not clear that the objection was about the disparagement of the defense's position. In any event, even if these comments and the discussion of the defense's evidence strayed beyond appropriate commentary on the strength of the defense's argument into personal commentary on defense counsel, they were not so egregious that they made the trial unfair, nor is it reasonably probable that the jury would have come to a different outcome if the prosecutor had not made these statements. (See *People v. Dykes* (2009) 46 Cal.4th 731, 760, 772.)

## G. Instructional Errors

Miranda-Guerrero raises a number of claims concerning the guilt phase jury instructions, each of which we have rejected previously. First, he argues that it was error for the superior court to instruct the jury on theories of first degree murder and felony murder because the information charged him only with a violation of Penal Code section 187, which he says describes only second degree murder. We have rejected this claim when it has

been brought in the past. (See, e.g., *People v. Contreras* (2013) 58 Cal.4th 123, 148 (*Contreras*).) We decline to reconsider our precedent on this issue.

Second, Miranda-Guerrero argues that the Sixth and Fourteenth Amendments to the federal Constitution, as interpreted in *Apprendi v. New Jersey* (2000) 530 U.S. 466, require more specificity in the charging instrument. We have rejected this claim as well (*People v. Nelson* (2016) 1 Cal.5th 513, 555) and decline to revisit our precedent.

Third, Miranda-Guerrero contends that six jury instructions used during his trial undermined the requirement of proof beyond a reasonable doubt. We have previously rejected this claim as to all of the instructions he identifies. (*People v. Nelson, supra,* 1 Cal.5th at pp. 553–554 [CALJIC Nos. 2.01, 2.02, 2.21.2, 2.22, 2.27]; *People v. Carey* (2007) 41 Cal.4th 109, 130 [CALJIC No. 2.21.1].) Miranda-Guerrero presents no persuasive reason why we should reconsider our holdings on this issue.

Fourth, he argues that the superior court erred by not requiring the jury to come to a unanimous verdict about which theory of first degree murder applied (premeditated murder or felony murder), so long as the jury unanimously concluded that he was guilty of first degree murder under some theory. As he acknowledges, we have rejected this claim before. (*People v. Jones* (2013) 57 Cal.4th 899, 973.) He presents no persuasive reason why we should reconsider our past holdings on this issue.

## H. Cumulative Error

Miranda-Guerrero contends that the cumulative effect of the errors he claims occurred at the guilt phase warrants reversal even if no individual error does so. The only potential

errors, such as the possibility that a few comments by the prosecutor exceeded the bounds of appropriate argument, were minor. The cumulative effect of these errors does not rise to the level of prejudice necessary to reverse any of his convictions.

### III. PENALTY PHASE ISSUES

Miranda-Guerrero argues that the admission of the statements he made in his police interviews requires reversal of his death sentence because the prosecutor used his statements to counter evidence of his cognitive impairments. Because we find no error in the admission of his statements, we need not consider their effect on the penalty verdict.

Miranda-Guerrero also argues that the death sentence is grossly disproportionate to the crime of felony murder absent a showing of some particular mens rea as to the killing. We have rejected this argument before (*Contreras*, *supra*, 58 Cal.4th at p. 163), and we do so again here. He also argues that imposing the death penalty for felony murder violates international law and that this international law principle is binding on our state because of the supremacy clause of the federal Constitution. We have rejected this claim as well. (*Contreras*, at pp. 165–166.)

Miranda-Guerrero argues that various other aspects of California's death penalty scheme are unconstitutional, while noting that our court has rejected these arguments in the past. He argues that our death penalty statutes are unconstitutionally overbroad because of the number of potential special circumstances; that the aggravating factor related to the circumstances of the crime is overbroad as well; that the lack of jury instruction regarding a burden of proof in the weighing of aggravating and mitigating factors undermined his constitutional rights; that the phrase "so substantial" in the jury

instruction on the weighing of aggravating and mitigating circumstances is impermissibly vague; that the jury should have been instructed to find whether death is "appropriate" rather than whether it is "warranted"; that the jury should have been instructed that there is a presumption favoring a sentence of life without the possibility of parole; that the jury should have been required to make written findings during the penalty phase; that the use of adjectives such as "extreme" and "substantial" in the sentencing factors creates an improper barrier to the consideration of mitigating evidence; that the jury should have been instructed as to which of the factors were mitigating and which were aggravating; that intercase proportionality review is required; and that equal protection requires more procedural protections for capital defendants than California law provides. We have rejected all of these arguments. (*Contreras*, *supra*, 58 Cal.4th at pp. 169–170, 172–173.)

He also argues that the jury should have been instructed that it must return a sentence of life without the possibility of parole if the mitigating factors outweighed the aggravating factors, and he says that California's use of the death penalty as a "regular form of punishment" violates international norms. We have rejected these arguments as well. (*People v. Jackson*, *supra*, 1 Cal.5th at pp. 373–374.)

Miranda-Guerrero further claims that California's death penalty scheme is constitutionally deficient because it does not require unanimous jury findings as to the aggravating circumstances and does not require the jury to find beyond a reasonable doubt any aggravating factors except prior felony convictions or violent crimes that did not result in a conviction. We have rejected these claims in the past (*People v. McDaniel*

(2021) 12 Cal.5th 97, 142–143; *People v. Anderson* (2001) 25 Cal.4th 543, 601) and decline to revisit our precedent here.

Finally, because we find no error in the penalty phase, we reject Miranda-Guerrero's claim that cumulative error infected the penalty determination.

## IV. CONCLUSION

The judgment is affirmed.

**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Miranda-Guerrero

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S118147
**Date Filed:**  November 17, 2022

_____

**Court:**  Superior
**County:**  Orange
**Judge:**  Francisco P. Briseño

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Denise Kendall, Assistant State Public Defender, and Evan Young, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Kristine A. Gutierrez and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Denise Kendall
Assistant State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Meredith S. White
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9069