Filed 7/12/23  P. v. Wilson CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KEVIN LAMONT WILSON, JR.,<br><br>Defendant and Appellant. | F084975<br><br>(Super. Ct. No. MCR072703)<br><br>**OPINION** |

**THE COURT**\*

APPEAL from a judgment of the Superior Court of Madera County.  James Oakley, Judge.  (Retired Judge of the Madera Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Matthew J. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*	Before Poochigian, Acting P. J., Franson, J. and Snauffer, J.

Defendant Kevin Lamont Wilson, Jr., was found guilty by a jury of assault with a semiautomatic firearm, and unlawful possession of a firearm and ammunition. He was sentenced to an aggregate term of 11 years. Appointed counsel for defendant asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was advised of his right to file a letter stating any grounds on appeal within 30 days of the date of filing of the opening brief. Defendant filed a letter identifying the following purported errors:[1] first, an error in jury selection caused by a potential juror expressing a belief in defendant's guilt; second, juror error caused by a juror not disclosing her relationship with law enforcement, the district attorney's office, and the judiciary; third, an error regarding the trial court's failure to release defendant from a warrant hold on an unrelated case; and fourth, error by the trial court in admitting evidence "after trial had already been started …." He has identified no basis for relief, nor have we. We affirm.

## PROCEDURAL SUMMARY

On May 3, 2022, the Madera County District Attorney filed a second amended information charging defendant with assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b); count 1),[2] assault with a firearm (§ 245, subd. (a)(2); count 2), unlawful possession of a firearm (§ 29800, subd. (a)(1); count 3), and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 4). As to counts 1 and 2, the second amended information further alleged that defendant personally used a firearm (§ 12022.5, subd. (a)) and had suffered a prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). As to counts 1

---

[1]     Defendant also requests that we relieve his appointed counsel and appoint new counsel based on appointed counsel's failure to raise the issues that defendant identified to him. Because we find no merit in defendant's arguments, as discussed below, we deny defendant's request.

[2]     Undesignated statutory references are to the Penal Code.

2.

through 4, the second amended information alleged that defendant's prior conviction also qualified as a prior serious felony conviction (§ 667, subd. (a)(1)). The second amended information further alleged five aggravating circumstances (Cal. Rules of Court, rule 4.421).

On May 26, 2022, the trial court dismissed count 2 on the People's motion. On the same date, defendant admitted that he suffered a prior conviction that made it unlawful for him to possess a firearm and ammunition.

On June 14, 2022, the jury found defendant guilty on counts 1, 3, and 4, and found true the personal use of a firearm allegation on count 1. In a bifurcated proceeding, the jury also found true the three aggravating circumstances presented to it and found true that defendant was previously convicted of robbery.[3]

On September 1, 2022, defendant filed a *Romero*[4] motion, requesting that the trial court exercise its discretion to strike defendant's prior strike conviction. The People opposed that motion.

On September 15, 2022, the trial court denied defendant's *Romero* motion, but struck the personal use of a firearm enhancement. The trial court sentenced defendant to an aggregate term of 11 years as follows: on count 1, six years (the lower term of three years, doubled due to the prior strike conviction), plus a five-year prior serious felony conviction enhancement (§ 667, subd. (a)(1)); on counts 3 and 4, 32 months (the lower term of 16 months, doubled due to the prior strike conviction), stayed pursuant to section 654.

On the same date, the trial court awarded custody credits, imposing the 15-percent limitation under section 2933.1, subdivision (a). The following day, the court corrected

---

[3]   On June 14, 2022, the trial court dismissed the aggravating circumstance alleging that defendant's prior convictions were numerous or of increasing severity. That question was not put to the jury.

[4]   *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

the custody credits, concluding that the 15-percent limitation did not apply because it had struck the firearm enhancement. The original abstract of judgment reflected the original award of custody credits. Defendant's appellate counsel filed an informal motion with the court pursuant to section 1237.1, and the court issued a second amended abstract of judgment reflecting the corrected custody credit award.

On September 16, 2022, defendant filed a notice of appeal.

## FACTUAL SUMMARY

### The People's Case In Chief

T.V. owned a package delivery company and worked as a driver for the company. On or about November 4, 2021, T.V. hired defendant to work for him as a driver. T.V. rented a cargo van for defendant to use on November 8, 2021. On November 11, 2021, defendant used that cargo van to deliver packages in Madera. On November 16, 2021, Madera County Sheriff's Detective Stanley Prince contacted T.V. regarding a specific package that was delivered in Madera County on November 11, 2021. Using the tracking number for the package, T.V. was able to determine that the driver identification number for the person who delivered the package for his company belonged to defendant. T.V. identified defendant to Detective Prince using a photograph of defendant's driver's license.

B.G. lived in Madera County for more than 20 years. He had been previously convicted of two criminal offenses. On November 11, 2021, he lived with his parents in Madera County. On the property, there were seven houses, mostly occupied by his family. There was a single-lane driveway for all of the houses and a sign at the driveway that said " 'no trespassing.' "

On November 11, 2021, when B.G. and his cousin, J.H., arrived home from work they noticed a cargo van parked on the property. The van was between bushes and partially obscuring the " '[n]o trespassing' " sign, to the left of the entrance to the driveway, and facing toward the street. B.G. testified that people had stolen from the

4.

property before and he was suspicious of the van's presence. J.H. parked the vehicle in the driveway, parallel to the van; he did not block the van's egress. After discussing whether they should approach the van for approximately 10 minutes, B.G. walked to the front driver's side window of the van; J.H. remained in his vehicle with the door open. Defendant sat in the driver seat of the van. He was using his phone and was wearing a black shirt, sweatpants, and a "do-rag." B.G. became more suspicious because defendant was not wearing any kind of delivery driver uniform. B.G. did not know defendant and had never seen him before.

B.G. tapped on the window, defendant rolled down the window, and B.G. asked, " 'Excuse me, what are you doing here?' " Defendant responded that he was delivering packages. B.G. did not shout, did not use any racial slurs, and he carried only his phone in his hands. Both of his hands were in front of his chest. B.G. then asked defendant to leave if he had already delivered the package. Defendant refused, repeating that he was on the property to deliver packages. B.G. asked defendant to leave twice more. Defendant refused. B.G. testified that he and defendant were getting angry, swearing at each other, and defendant was staring at him. B.G. did not touch defendant, threaten defendant, make any furtive gestures, or ball his hands into fists. The conversation lasted for approximately five minutes. Defendant then showed B.G. a backpack and B.G. responded, "what are you going to do with a backpack? … What you got in there? A little gun, or what? … [Defendant said] oh yeah, oh yeah." B.G. said to defendant, "if you want to pull it out, pull it out." B.G. raised his hands to shoulder height with his one palm toward defendant and the other hand holding his phone, and began backing away. J.H. announced that he was calling the police and told defendant to leave. Defendant opened the door to the van, removed a semiautomatic handgun from the

5.

backpack, and loaded it with a magazine. He got out of the van, pointed the handgun at B.G., and told B.G. to back up.[5]

B.G.'s neighbor's dog began to approach B.G. at a run and defendant noticed the dog. Defendant chambered a round in the handgun, pointed it at the dog, and told B.G. to keep the dog away from him. B.G. continued to back away, put his phone into his back pocket, and put his hands back up. Defendant began "tripping out" that B.G. had put something into his pocket or had something in his hand, and B.G. responded, " 'I just put my phone away, dude.' " B.G. attempted to keep the dog away from defendant. He also told defendant that if defendant shot the dog B.G. might hit him or "beat his a**." Eventually, the dog walked back toward the neighbor's house without any further direction from B.G. Defendant again pointed the handgun at B.G. B.G. told defendant that defendant "could leave. [Defendant] already ha[d] B.G. … far away from [the] van. … [B.G.] ha[d] [his] hands up. [Defendant] ha[d] a gun pointed at [him]." J.H. again announced that he had called the police and told defendant to leave.[6] Defendant got back into the van and left.

On November 11, 2021, at approximately 3:24 p.m., Madera County Sheriff's Detectives Brendan Johnson and Stanley Prince, were on duty in an unmarked, brown pickup. Neither was wearing a full uniform. They passed the location of the incident in this case and Detective Johnson saw the cargo van, J.H's vehicle, and defendant pointing a handgun at B.G. while B.G. held his hands in the air. Detective Johnson did not see anything in B.G.'s hands. Detective Johnson estimated that defendant was approximately

---

[5]   B.G. testified that defendant repeatedly told him to "back off." However, he did not identify when defendant told him to back off other than when he pointed the handgun at B.G.

[6]   It is unclear from B.G.'s testimony whether J.H. announced that he called the police more than one time. However, he described J.H. having said that he called the police when B.G. initially backed away from the van and immediately before defendant left the property.

20 feet from G.B. After passing the property, Johnson drove 200 to 300 yards, made a U-turn, and got out of the pickup to put on his ballistic vest, which identified him as a deputy sheriff. As he was putting on his vest, he observed the cargo van driving in the opposite direction as his vehicle. He made another U-turn and followed the van. Prince was able to see the van's license plate and put out a call over the radio. Soon after, they lost sight of the van.

Detective Prince interviewed B.G. shortly after he and Detective Johnson lost sight of the van. He could tell B.G. was frightened and "nervous about what had just taken place." B.G. was speaking quickly; Detective Prince told B.G. to take a deep breath and calm down. Prince acknowledged that B.G.'s demeanor was also consistent with someone who was angry. Prince obtained the package that was delivered to the property on that date and took a photo of the shipping label. Prince also contacted the regional manager for the company that rented the cargo van that defendant drove. He obtained the rental agreement for the van based on the license plate number. That rental agreement led him to T.V. When Detective Prince provided the tracking number from the package shipping label, T.V. provided him with defendant's name and date of birth. Prince obtained a photo of defendant from a law enforcement database and sent it to T.V. T.V. confirmed that the photo depicted defendant.

Detective Prince used a law enforcement database to determine defendant's address. On December 3, 2021, Prince went to defendant's address. In front of the home, he saw a black car registered to " 'Kevin Wilson.' "[7] On December 8, 2021, Prince went to defendant's home, detained defendant, and took a statement from him. On the same date, he executed a search warrant at defendant's home. In the back bedroom of the home, Prince found a bag containing a small, black semiautomatic handgun, loaded

---

**7**    Detective Prince did not indicate whether the vehicle was registered to defendant or Kevin Wilson, Sr.

with a magazine containing ammunition. The firearm appeared to be operable. The bag also contained one loose round of ammunition.

**Defendant's Case**

Defendant testified that he was convicted of robbery in 2019 and was prohibited from possessing a firearm or ammunition on that basis.

Defendant obtained a job delivering packages for T.V.'s package delivery company. He was excited to work for T.V. because it was a way for him to keep active and out of trouble. Defendant's employment with T.V. did not require him to wear a uniform. As part of his job as a delivery driver, defendant delivered packages in rural areas, encountered aggressive dogs "[a]ll the time," and was concerned for his safety "[a]ll the time." Most of the time, when he encountered aggressive dogs or dangerous situations, he ran. At first, defendant did not carry any weapons, "but after a while, … people would … chase [him] down.[8] So … after that, [he] had to carry a firearm." He kept the firearm in the small pocket of his backpack.

On November 11, 2021, defendant worked for T.V. delivering packages in Madera County using the rented cargo van. He went to the property where B.G. lived to deliver a package. He parked by the bushes outside of the residential area. He saw an approximately 50-pound dog roaming and barking and asked a resident to get the dog so he could deliver the package. He was frightened by the dog. The resident calmed and contained the dog and defendant delivered the package and walked back to the van.

Defendant went to the back of the van to scan the packages he had not delivered so they could be returned to the warehouse. There were only about five packages he did not deliver so the process took him only about "a minute or two." He then returned to the

---

**8**    Defendant clarified that he had not encountered people who were aggressive with him but when he went "to a nice area … in a [rental cargo van], [with his] skin tone, [his] skin color—they [did not] want [him] there, so they[ did] certain things that[ were] out of the ordinary."

driver seat of the cargo van, called the hiring manager for his other job with a temporary employee staffing agency, and smoked a tobacco cigar. As he did so, he saw the people he delivered the package to leave and G.B. and J.H. pull into the driveway. Within 15 seconds of parking in the driveway, G.B. walked to the cargo van and knocked on the front driver's side window. Defendant rolled down his window and G.B. asked defendant what he was doing there. Defendant responded, " 'I'm delivering packages. I'm working right now.' " G.B. responded, " 'No, you're not. You're smoking weed.' " Defendant told G.B. he was not smoking "weed" and showed G.B. the tobacco cigar. G.B. then "got mad about it and [asked], 'Well, what are you still doing here? You have no … business here.' " Defendant showed G.B. some of the packages in the front seat and told him that he just delivered packages on the property. G.B. did not "accept that answer" and appeared to defendant to be "very mad." G.B. accused defendant of being there to "rob[] the place." Defendant denied being at the property to commit a robbery, pointed to visible packages in the front seat, and told G.B. that he had his hiring manager on the phone listening to the conversation. B.G. then began cursing at defendant, saying: " 'You better get your b***h-a** out of here before you get f***ed up.' "

Defendant then got out of the van "to show [G.B.] that [defendant was] not a threat and [was] not [t]here to rob the place." G.B. called him the N-word and threatened to " 'beat [his] a** for being parked on [G.B.'s] property.' " G.B. stood no more than two feet from defendant when he made that threat. Defendant also saw that J.H. was nearby and the door to his vehicle was open. Defendant testified that "[a] lot of things went through [his] head" in that moment: he was afraid that he was going to be "jumped" by multiple people, he wanted to leave, and he wanted to explain his situation to avoid "a bad rating" or negative customer exit survey. When G.B. threatened and cursed at defendant, the dog approached defendant, barking. Defendant saw the dog approaching and grabbed his backpack containing the handgun. He testified that at that moment he thought he was in imminent danger. G.B. taunted defendant, saying " 'What

do you got in your backpack there?  A gun?  You're not the only one with guns.' " As the dog approached, defendant drew the handgun from his backpack and pointed it at the dog.  He told defendant to calm his dog down and for "[e]verybody [to] just calm down and back off."  He told G.B. to back off five or six times.  G.B. was angry.  Defendant told G.B. he "wasn't going to shoot or kill no one."  G.B. said, " 'If you shoot my dog, I'm going to beat your a**,' " and " 'Shoot me if you're going to shoot.  Shoot.' "  G.B. and the dog both backed away from defendant.  But as G.B. backed away, he did something with his hand and, at the time, defendant did not know what G.B. was doing.  Defendant told G.B., " 'Don't make any false movements, please.  Just back off.' "  G.B. continued to taunt defendant, saying " 'What are you going to do?  You're not going to do nothing.  Just shoot.' "  Because G.B. was far enough away for defendant to get away, he got into the cargo van and left.

As he drove away, he noticed a pickup chasing him.  He was scared so he fled on the freeway.

On December 8, 2021, defendant spoke to Detective Prince.  A recording of part of the conversation was played for the jury.  In the recording, defendant described largely the same incident that he described in his testimony.  Defendant testified that before he drew his handgun, B.G. had threatened to fight him.  He acknowledged that he did not tell Prince about B.G.'s threat.

J.H. testified that when he and G.B. saw the cargo van upon returning home from work that G.B. told J.H. to stop so he could talk to the driver.  G.B. waited in the vehicle for only one or two minutes before he approached the cargo van.  J.H. further testified that he did not call the police, his fiancée did while she was watching the interaction between G.B. and defendant from the front window of her home and saw G.B. back away with his hands raised.  When J.H. saw G.B. backing away from defendant, J.H. opened the door to his vehicle and saw that defendant had a handgun pointed at G.B.  Approximately eight minutes passed between the time G.B. exited J.H.'s vehicle and

10.

when J.H. saw the handgun. J.H. did not recall whether G.B. used any racial slurs when talking with defendant.

### The People's Rebuttal Case

Detective Prince testified that when he first interviewed defendant on December 8, 2021, defendant denied having been the person who pointed a gun at B.G. At that time, defendant denied having a firearm. During the second interview on the same date, defendant did not mention that B.G. "threatened to beat his a**," that he opened the door to the cargo van to show defendant the packages inside, that he was afraid, or that he was worried about his job or customer review ratings. Defendant did tell Prince that B.G. was " 'f***ing with [him]' " and defendant " 'pulled out' " to back him up.

## DISCUSSION

### *Wende* Review

As noted above, defendant's appellate counsel filed a brief pursuant to *People v. Wende*, *supra*, 25 Cal.3d 436, asserting he could not identify any arguable issues in this case. After defendant's appellate counsel filed his *Wende* brief, by letter dated April 14, 2023, we invited defendant to inform this court of any issues he wished addressed. On April 20, 2023, defendant responded to our letter, identifying four issues for our review. First, defendant contends that "[b]efore trial was set[, the] jury had already [decided he was] guilty because one person shouted out if he was shooting [and] already [determined] to[] have weapons he[ was] guilty …." Rather than dismissing the jury panel, defendant contends the trial court took a recess and "explain[ed] to[ the jury] carefully what the rules [were] for trial cases …." As a threshold matter, pursuant to California Rules of Court, rule 8.834(c)(2), the court reporter did not transcribe the jury voir dire because it was not designated for transcription. However, during a break from voir dire, the trial court discussed a potential juror having misunderstood the clerk's reading of the second amended information. The potential juror "thought that the clerk had mentioned the word 'probation,' and that was not mentioned by the clerk." Defendant's counsel

11.

commented that the juror made a statement about probation and, "although she was mistaken, she was very vocal and sounded very authoritative on that matter …." He argued that the potential juror's statement "prejudice[d] [defendant] for the rest of th[e] proceeding." Because defendant's counsel understood the juror to suggest defendant was on probation, he moved for a mistrial. The prosecutor responded that all of the potential jurors questioned to that point had expressed that they could be "fair and impartial."

The trial court denied defendant's motion and explained its reasoning: "the error … [was] correctable." The juror apparently misheard the clerk's reading of the second amended information, but the court could "correct [the mistake] so the jurors … [would] have in their mind[s] what the correct statement [of the second amended information was]." The court could not conclude "the rest of the jury [was] … poisoned by one [potential] juror who [was] mistaken as to what she heard. [The court could] make that clear to the jury that [the potential juror] was mistaken about what she heard.

We agree with the trial court that, in light of the potential juror's statements that she could remain fair and impartial, admonishment of the jury regarding the potential juror's misunderstanding cured any possible prejudice. (*People v. Westerfield* (2019) 6 Cal.5th 632, 731–732 [" 'we cannot assume on a silent record that [jurors] ignored [such orders and admonishments]' "]; *Murphy v. Florida* (1975) 421 U.S. 794, 800 [" 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' "].) Insofar as that was the purported incident of juror misconduct, we find no error.

Later in the jury selection process, defense counsel raised a for-cause challenge to another potential juror who stated that if he found defendant guilty on one count, "he[ would] necessarily have to find him guilty on another" count. The prosecutor responded

12.

that throughout the questioning of that potential juror, by both defense counsel and the prosecutor, "he … repeatedly affirmed that he [could] be fair and impartial, and underst[ood] the importance of not making judgments prior to hearing evidence." The trial court denied the for-cause challenge, noting that the juror's question or comment was likely "based solely upon the nature of the charges that he was made aware of[9] … [a]nd … after [the court's] explanation to him, [the court believed] he understood that each charge [was] to be treated independently. And he did indicate that he could be fair and impartial." Because the trial court instructed the juror that each count was to be treated independently, and thereafter the juror indicated he could be fair and impartial, we find no error. (*Murphy v. Florida*, *supra*, 421 U.S. at p. 800.)

Second, defendant contends that, during the trial, a female juror spoke to one of defendant's friends "who worked with her during trial [and] occasionally Madera Police, [the district attorney's office], [and] Judges." The record before us reflects no such conversation. Because these claims require consideration of facts outside the record on appeal, we cannot consider their merits here. (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 23; *In re Carpenter* (1995) 9 Cal.4th 634, 646 [review on direct appeal "is limited to the four corners of the record on appeal"].) Such claims are more appropriately raised in a petition for writ of habeas corpus. (*Miranda-Guerrero*, at p. 23.)

Third, defendant attributes error to a purported remark by the trial court regarding exoneration of a warrant and hold, presumably on a violation of probation for defendant's 2019 robbery conviction.[10] Defendant contends that, "[w]hen sentencing was wrapped

---

**9** To wit, the jury was informed that defendant was charged with assault with a semiautomatic firearm as well as unlawful possession of a firearm and ammunition. From the trial court's description of the exchange, the potential juror likely asked whether defendant would necessarily be guilty of unlawful possession of a firearm if he was guilty of assault with a semiautomatic firearm.

**10** The probation officer's report reflects no convictions other than the 2019 robbery conviction and no new charges. Further, in making his sentencing recommendation, defendant's trial counsel asked the court to consider that defendant "still [had] to go to

up," the court said defendant "would not have to worry about [the warrant and hold] because they will dismiss it or run it concurrent …." He claims that the trial court was not correct, and he is "still on an active [h]old right now." Even assuming the trial court made the statement, he is entitled to no relief in this action for two reasons: first, the purported comment by the trial court is not reflected in the record on appeal and therefore cannot be addressed on direct appeal (*Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 23); second, assuming that the warrant and hold were based on the violation of probation, the Madera County Superior Court judge who presided over this case was not required to resolve the violation of probation in defendant's Fresno County Superior Court case.[11]

Fourth, defendant contends that the trial court erroneously allowed admission of "more evidence in the case after trial had already been started …." Specifically, it allowed admission of an audio recording of defendant's second interview by Detective Prince on December 8, 2021. During defendant's testimony, the prosecutor played a short segment of that interview and defendant authenticated the recording. No objection was made at trial to admission of that recording and the remainder of the recording was played. Any objection was therefore forfeited. (*People v. Partida* (2005)

---

Fresno County and deal with the violation of probation." Presumably, any warrant and hold attached to defendant are related to that violation of probation.

The trial court noted that it was unsure whether defendant was on probation at the time of the offense in this case because, although he was granted a four-year term of felony probation for his 2019 robbery conviction, the term of probation might have been reduced to two years based on Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 328, § 2). Effective January 1, 2021, Assembly Bill No. 1950 (2019–2020 Reg. Sess.) amended section 1203.1 to limit the maximum probation term a trial court is authorized to impose for most felony offenses to two years. However, the Legislature included an exception under section 1203.1, subdivision (*l*)(1) for "violent felony" convictions listed in subdivision (c) of section 667.5. Robbery is one of the listed violent felony offenses (§ 667.5, subd. (c)(9)) so the general two-year limit to felony terms of probation did not apply (*People v. Schulz* (2021) 66 Cal.App.5th 887, 898–899).

[11] Defendant may request sentencing on the violation of probation from the Fresno County Superior Court in the manner specified in section 1203.2a.

14.

37 Cal.4th 428, 436.) Even if the issue was not forfeited, defendant's statement to law enforcement was not inadmissible for any reason evident on the face of the record. To the extent defendant argues that the prosecutor did not timely disclose the recording, that argument is unsupported by the record. We find no error in admission of the recording.

In short, after a thorough review of the record, we agree with defendant's appellate counsel there are no arguable issues in this case. There is nothing in this record to suggest any error occurred. For that reason, we deny defendant's request to relieve his appellate counsel and appoint new counsel.

## DISPOSITION

The judgment is affirmed.