Filed 6/25/24  P. v. Rivera CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL ANGEL RIVERA, JR.,<br><br>　　　Defendant and Appellant. | A168011<br><br>(San Mateo County<br>Super. Ct. No. SC080432B) |

Defendant Miguel Rivera was sentenced to 35 years to life in prison after pleading no contest to second degree murder based on his participation in the 2012 gang-related killing of Christopher Baker.  Rivera later sought resentencing under Penal Code former section 1170.95 (now section 1172.6).[1] The trial court denied his petition, concluding that he failed to make a prima facie showing of eligibility for relief.  Rivera appealed, and we reversed and remanded for the court to issue an order to show cause and conduct further proceedings.  (*People v. Rivera* (2021) 62 Cal.App.5th 217, 223–224 (*Rivera I*).)

---

[1] All further statutory references are to the Penal Code unless otherwise noted.  In 2022, former section 1170.95 was renumbered to section 1172.6 without substantive change.  (*People v. Delgadillo* (2022) 14 Cal.5th 216, 223, fn. 3.)

On remand, the trial court conducted an eight-day evidentiary hearing. The court then concluded beyond a reasonable doubt that Rivera "participate[d] in the intentional killing" of Baker and denied the resentencing petition. Rivera now appeals from that order, claiming that (1) there was insufficient evidence that he was the actual killer or aided and abetted the murder and (2) the admission of his statement to a jail deputy violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We reject both claims and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.    *Procedural History Through* Rivera I

In 2014, a grand jury indicted Rivera and his codefendant, Jerry Coneal, for Baker's murder. As set forth in *Rivera I*, "[t]he operative indictment's only count alleged that Coneal and Rivera 'did willfully, unlawfully, and with malice aforethought murder [Baker] . . . ,' with accompanying gang and lying-in-wait special circumstances as to both defendants. The indictment also alleged other gang-related enhancements as to both defendants, one that the offense was committed to benefit a gang and the other that a principal personally and intentionally discharged a firearm causing death during such an offense. . . . Finally, the indictment alleged various enhancements against Rivera based on a prior conviction of attempted burglary." (*Rivera I*, *supra*, 62 Cal.App.5th at pp. 224–225, fn. omitted.)

"In July 2017, as part of a plea agreement, Rivera entered a plea of no contest to second degree murder, admitted the offense was committed to benefit a gang, and admitted the [prior conviction was a serious felony]." (*Rivera I*, *supra*, 62 Cal.App.5th at p. 225.) He stipulated that the transcript

2

of the grand jury proceedings provided a factual basis for the plea. (*Id.* at pp. 225–226.) "Later that month, the [trial] court sentenced Rivera to 35 years to life in prison, composed of a term of 15 years to life for murder, doubled because of the strike, and a consecutive term of five years for the prior conviction of a serious felony." (*Id.* at p. 225.) Meanwhile, Coneal was sentenced to life in prison without the possibility of parole after a jury convicted him of first degree murder and found true both special circumstances. (*People v. Coneal* (2019) 41 Cal.App.5th 951, 958, 973 [affirming judgment].)

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) amended sections 188 and 189 "to limit liability for murder under the doctrines of felony murder and natural and probable consequences" and enacted former section 1170.95 to permit defendants convicted of murder on either theory to seek resentencing. (*Rivera I, supra,* 62 Cal.App.5th at pp. 223, 227.) Soon after the new law took effect, "Rivera filed a petition claiming he was eligible for relief because he entered a plea to murder 'in lieu of going to trial because [he] believed [he] could have been convicted of 1st or 2nd degree murder at trial pursuant to the felony murder rule or the natural and probable consequences doctrine.' . . . [¶] The People [responded] that Rivera failed to make a prima facie showing of eligibility for relief because the record demonstrated that the prosecution proceeded on 'a single basis of liability reliant on a theory that [Rivera] jointly possessed malice aforethought with . . . Coneal when they murdered . . . Baker.' " (*Id.* at p. 226.) Rivera replied "that he could not now be convicted of murder 'because of the elimination of the natural and probable consequences doctrine,' " relying on a case involving a conviction of second degree murder under that doctrine that was based on the intent to participate in a gang

3

assault.  (*Ibid.*)  At this stage of the proceedings, "there was no dispute Coneal was the actual shooter," and "Rivera highlighted the lack of evidence that he shared or knew of Coneal's intent, that he knew Coneal had a gun, or that he assisted Coneal in any way except by driving the car" in which the two traveled to the scene of the crime.  (*Id.* at pp. 224, 226.)

The trial court denied Rivera's petition for resentencing, determining the petition "fail[ed] to make a prima facie showing of eligibility for relief on the basis that Rivera was charged with and 'entered a plea to second degree murder with malice.' "  (*Rivera I, supra,* 62 Cal.App.5th at pp. 226–227.) Rivera appealed, and we reversed, concluding that "a defendant who entered a plea to murder 'with malice aforethought' is not categorically incapable of making a prima facie showing of eligibility for relief under [former] section 1170.95, subdivision (c) . . . , because such a plea is not necessarily an admission that the crime was committed with actual malice."  (*Id.* at p. 224.) We also held that Rivera made the required prima facie showing because he "identif[ied] a scenario under which he . . . was guilty of murder only under a now-invalid theory," regardless of whether the grand jury transcript to which he stipulated as the factual basis for his plea showed the indictment did not rest on that scenario.  (*Ibid.*)  We therefore remanded the matter for the court to issue an order to show cause and conduct further proceedings.  (*Id.* at p. 239.)

### B.    *The Evidentiary Hearing*

In the spring of 2023, the trial court conducted a multiday evidentiary hearing under section 1172.6, subdivision (d)(3).  Several witnesses testified, and numerous exhibits were admitted.  No evidence from Coneal's trial was introduced, and no evidence from the grand jury proceedings is in our record except to the extent it was independently admitted or used for impeachment

4

in the evidentiary hearing.  Thus, the facts discussed below are drawn solely from the evidence presented at that hearing.  Because Rivera now claims there was insufficient evidence that he had or fired a gun, we describe the ballistics evidence in particular at length.

      1.     The murder and the physical evidence

Baker, who was 21 years old, was shot to death in a residential neighborhood of East Palo Alto on October 5, 2012.  At the time, two gangs with territory in the city, Taliban and Da Vill, had "a violent rivalry" that had resulted in "several homicides and attempted homicides."[2]  Coneal and 21-year-old Rivera were Taliban members, and Baker was associated with Da Vill.  Five days before Baker's murder, Da Vill members attempted to kill two Taliban members, and two days after Baker's murder, a Da Vill member shot and killed a Taliban member.

Around 8:20 p.m. on the night of Baker's murder, the East Palo Alto police received civilian and ShotSpotter reports of gunfire on the 2200 block of Terra Villa Avenue, between Garden Street and Beech Street.  A few minutes later, the first police officer to respond located a yellow bicycle lying in the road, near Terra Villa's intersection with Garden.  The bicycle was later identified as Baker's.

Near the bicycle, an unoccupied Ford Escort was stopped on the sidewalk, sandwiched between a chain-link fence running along the sidewalk and a Honda Civic legally parallel parked on the street.  Both cars were facing in the direction of Garden.  The Escort's engine was running, its reverse lights were on, and its driver's door was open.

---

[2] A large amount of gang evidence was introduced, much of which is unnecessary to detail for purposes of this appeal.

The police officer was summoned to the other side of Terra Villa by a neighbor who indicated there was an injured person in her driveway. Baker was lying on his side at the top of the driveway of 2247 Terra Villa, near the house's garage. He "appeared to have sustained some gunshot wounds," and he was still breathing but "unresponsive." After the paramedics arrived, Baker was declared dead.

Baker was wearing a T-shirt with a photograph of Brandon Bradford on it and the text "REST IN PEACE BOX." Bradford, a Da Vill associate known as "Box," was killed the previous year. That night, a vigil was held for Bradford at his home on Garden, around the corner from where Baker was killed. A gang expert testified that anyone associated with Bradford "would automatically be a target for the Taliban," and in particular "any young male" near the vigil and wearing a shirt like Baker's "would have potentially been in danger for the Taliban to come after them seeking to kill a member of the Da Vill gang."

Baker was lying in a significant amount of blood, and spatters of his blood were on other areas farther down the driveway, including near the sidewalk. He was turned over so his body could be removed from the scene, showing that his hip area had been resting on a nine-millimeter Kel-Tec semiautomatic handgun. The gun contained eight unfired rounds, one in the chamber and seven in the magazine. There was no evidence that this gun was ever fired at the scene.

Baker died of multiple gunshot wounds. He was shot nine times, including in his forearm, chest, and back. A bullet and a bullet jacket fragment were found during his autopsy, in his shoulder and forearm respectively. Both were fired by the same firearm, a revolver. Revolvers

usually have a six-bullet capacity, and unlike other handguns, they do not automatically expel cartridge casings after being fired.

The same revolver fired a third bullet that hit the garage door of 2247 Terra Villa, right behind where Baker's body was found. The garage door had four other apparent bullet holes in it. Four cartridge casings fired from the same nine-millimeter Luger semiautomatic handgun (the Luger) were in the driveway near Baker's body, and there was a fragment of a bullet not shot by the revolver next to the driveway.

Five other cartridge casings fired by the Luger were in the street near Baker's bicycle. There were also several bullet fragments in the same general area of the street, one of which could have been shot by the same gun that shot the bullet fragment recovered near the driveway of 2247 Terra Villa.

A separate group of 16 SIG .357-caliber cartridge casings were located at the intersection of Terra Villa and Garden, near the house where the vigil was held. All these casings were fired by the same semiautomatic handgun, likely a Glock (the Glock). There was a direct sight line from the location of these cartridges to Terra Villa. The evidence tended to suggest the Glock shot most of the bullet fragments found in the street on Terra Villa.

The crashed Escort was registered to L.C., Rivera's then-girlfriend who lived with him in East Palo Alto. There were nine "bullet impact sites" to the front of the car, including three bullet holes in its front windshield, and two bullet strikes on the front passenger door. About a dozen bullets and bullet fragments were recovered from inside the car. The evidence tended to suggest the Glock fired these bullets and fragments.

Coneal's blood was inside the Escort, including on the driver's-side floorboard and the steering wheel. There was also a smear of his blood on the

7

passenger's side of the Civic parked next to the Escort. A black sweatshirt with Rivera's DNA on the interior of its hood was on the Escort's floorboard behind the driver's seat. The sweatshirt was printed with the text "R.I.P. 'P,' " underneath which there were several photographs of Paris Meacham, a Taliban member murdered in 2009.

A couple who lived two houses down from 2247 Terra Villa in the direction of Beech both testified about what they witnessed that night. As they were eating dinner, the woman heard two "loud" gunshots and a sound "[l]ike a screech. Like a car crash." When she looked out the front window, she saw two men running together down Terra Villa toward Beech. Similarly, her boyfriend heard several gunshots coming from the direction of Garden and then what "[s]ounded like a car hitting something." Next, he saw two people run past his front window in the direction of Beech. When the couple went outside a few minutes later, the Escort was crashed against the fence and Baker's bicycle was in the street.

The ShotSpotter system detected two "incidents" of gunfire in the area, the first near 2247 Terra Villa and the second on Garden near the vigil. During the first incident, 15 shots were fired beginning at 8:20:00 p.m. and ending about nine seconds later. The first five shots were detected near where Baker's bicycle was found, and the remaining shots were detected near 2247 Terra Villa's driveway. Based on the short amount of time between shots, it was very likely that at least two weapons were fired by two shooters during this incident.

Nineteen shots were fired during the second incident, which began at 8:20:17, about eight seconds after the first incident ended. They were clustered in a tighter location than those from the first incident, and there was no indication they came from more than one weapon.

2.      Evidence of Rivera's actions before and after the murder

L.C. testified that around 6:30 p.m. on the night Baker was killed, Rivera picked her up from work in the Escort and drove her to their home.[3] At the house, Rivera "grabbed his . . . RIP Paris sweater," which L.C. identified as the same one recovered from the Escort's backseat. Rivera then left again, saying he was taking her car. She stayed to get ready for a party she planned to attend.

Around 8:00 p.m., L.C. called Rivera to see whether he was coming back to get her. After making three or four unanswered calls, she finally reached him, and "he said he was on his way." Soon afterward, Rivera called L.C. back. Sounding "out of breath," he told her to report the Escort as stolen. L.C. asked him how it was stolen, and he said someone took the keys and "drove off with the car."

L.C. indicated that after getting off the phone with Rivera, she "immediately" called 911. During the 911 call, which was received at 8:26 p.m., L.C. stated that the Escort had just been stolen from her boyfriend, who "told [her] to call the police." Unable to give details about what happened, L.C. provided Rivera's name and phone number.

After ending the 911 call, L.C. called Rivera again. As he was "explaining how [her] car got stolen and where he was," she heard a male voice in the background asking why Rivera told L.C. to report the car as

---

[3] L.C. testified under a grant of use immunity. After she repeatedly claimed not to remember numerous relevant facts, the trial court found that she was being purposely evasive and permitted the People to introduce her prior inconsistent statements. (See Evid. Code, § 1235.) Most of our references to what she "testified" are to testimony she acknowledged giving before the grand jury.

9

stolen. Rivera then asked whether L.C. gave the 911 operator his name, and when she said she had, he asked her why she had done that.

L.C. was in their bedroom when Rivera returned home at some point later that night. He was wearing only underwear, and he had dried blood on his stomach that he indicated was Coneal's. Specifically, Rivera told L.C. he was driving the Escort with Coneal as a passenger when someone shot at them on Terra Villa. Coneal "got grazed" during the shooting, and Rivera crashed the car. Rivera told L.C. he had disposed of the clothing he was wearing, and while they talked he washed the blood off his body. He also told her not to talk to the police.

Later that night, Rivera was arrested. According to the police officer who took his DNA sample, Rivera had "[a] strong odor of bleach on his hands." He told the officer that he had been washing dishes. The sweatshirt Rivera was wearing when he was arrested (not the "RIP Paris" sweatshirt) had "several" particles consistent with gunshot residue on it.

The day after the murder, when L.C. visited Rivera in jail, she asked him who had killed Baker. L.C. testified that Rivera "wouldn't say, but he said he knew who did it." Rivera also told her that there had been "a candlelight" for Bradford in the area where Baker was killed.

The People introduced a significant amount of evidence from Rivera's Facebook account and cell phone. Much of this evidence was relevant to prove Rivera's and Coneal's association with each other and the Taliban gang. Rivera also had photographs of both a semiautomatic handgun and a revolver, as well as videos of himself shooting both types of weapons at a shooting range that he posted to Facebook about six weeks after Baker's death. Around the same time, Rivera also posted a graphic of two laughing emojis with the text "Murder Ain't Funny But We Do Love to Laugh!!!"

10

## C.    *Closing Arguments and the Trial Court's Ruling*

In closing, the prosecutor argued that Baker was the victim of "a stone cold execution," not a felony gone wrong.  The prosecutor contended that Rivera was "one of the killers," and he and Coneal undertook a "joint effort" to murder Baker as a result of the gang rivalry.  Defense counsel responded that the prosecution had not proven that Rivera either directly committed or aided and abetted the murder.  Counsel claimed there was insufficient evidence that Rivera was even present during the crime, much less that he possessed any of the guns discharged during the incident or knew Coneal had a gun.

The trial court found beyond a reasonable doubt that Rivera was guilty of murder as "an actual killer of . . . Baker."  The court concluded that "Rivera had the motive, the opportunity, and the means by which to participate in the intentional killing of . . . Baker," based on the evidence of the gang rivalry between Taliban and Da Vill and of Rivera's possession of L.C.'s car that night.  The court also found it was proven "beyond any shadow of a doubt that there were multiple shooters in the death of . . . Baker," given the ballistics evidence and the testimony that two people ran away after the shooting.  Finally, there was significant physical evidence that Coneal and Rivera were both at the scene of the murder.

## II.
## DISCUSSION

### A.    *Proceedings Under Section 1172.6*

As mentioned above, Senate Bill No. 1437 limited liability for murder in two primary respects.  First, the legislation amended the felony-murder rule to provide that someone who participates in a qualifying felony "in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer; [¶] (2) The person was not the actual

11

killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e); Stats. 2018, ch. 1015, § 3.)

Second, the legislation "amended section 188 to require that, when the felony-murder rule does not apply, a principal in the crime of murder 'shall act with malice aforethought,' and that '[m]alice shall not be imputed to a person based solely on [the person's] participation in a crime.' " (*People v. Offley* (2020) 48 Cal.App.5th 588, 595, quoting § 188, subd. (a)(3).) This change abolished the natural and probable consequences doctrine, under which a person who aided and abetted a crime whose natural and probable consequence was murder was guilty of murder. (*Offley*, at p. 595.) "The change did not, however, alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' " (*Id.* at pp. 595–596.)

As relevant here, section 1172.6 provides a mechanism for defendants "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to seek resentencing. (§ 1172.6, subd. (a).) When a defendant makes a prima facie showing of entitlement to relief, which Rivera did, the trial court must "hold a hearing to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced." (§ 1172.6, subd. (d)(1).)

12

At that hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.  The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law . . . .  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. . . .  If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated."  (§ 1172.6, subd. (d)(3).)  Where, as here, "murder . . . was charged generically, and the target offense was not charged," if the petitioner is entitled to relief the murder conviction "shall be redesignated as the target offense or underlying felony for resentencing purposes."  (§ 1172.6, subd. (e).)

B.      *There Was Substantial Evidence that Rivera Shot Baker.*

Rivera claims there was insufficient evidence "to prove his guilt of murder beyond a reasonable doubt, either as the actual shooter or as an aider and abettor."  We conclude there was substantial evidence supporting the trial court's finding that he was an actual killer.  Thus, we do not address whether there was also sufficient evidence that he aided and abetted Coneal in murdering Baker.

We review the trial court's denial of a resentencing petition after a section 1172.6 evidentiary hearing for substantial evidence.  (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476.)  "Under this standard, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact

13

could find the defendant guilty beyond a reasonable doubt." . . . In so doing, [we] "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Ibid.*)

On appeal, Rivera does not challenge the trial court's findings that he was present during the murder and had a gang-related motive to kill Baker. Nor does he contest that his later conduct, including his request that L.C. report the Escort stolen and his Facebook posts, tends to prove he was involved in the crime. Rather, he claims he was not proven to be an actual killer because there was "[n]o evidence" that he "had a gun" or "fired a gun" at the scene. The record belies his position.

The evidence strongly suggests that there were three shooters: two, armed with the revolver and the Luger, who were responsible for the first round of shots fired on Terra Villa, and a third, armed with the Glock, who was responsible for the second round of shots fired on Garden.[4] Crucially, contrary to Rivera's suggestion otherwise, there was no singular "fatal shot," much less one that plausibly could have been fired by the Glock. Baker was shot nine times, and two bullets from the revolver were found in his body. Given the timing of the first round of gunshots and the fact that revolvers generally can hold only six bullets, it was reasonable to infer that Baker was hit by shots from both the revolver and the Luger.

In turn, the evidence as a whole supports a reasonable inference that Rivera and Coneal were the ones armed with the revolver and the Luger and

---

[4] Rivera states that "the ballistics evidence showed at least three separate firearms and possibly four," but there was no evidence to suggest a fourth firearm was fired at the scene. Contrary to what Rivera states in his briefing, a firearms expert clearly testified that all nine of the nine-millimeter cartridge casings recovered on Terra Villa "were fired by one and the same unknown firearm."

were thus both actual killers of Baker. Rivera and Coneal were undoubtedly at the scene together in the Escort, and they had a clear gang-related motive to target Baker. As the Escort drove toward Garden, it was also the target of gunshots, which it was reasonable to infer were fired by the Glock following the separate collection of shots fired near Baker. As the prosecutor argued below, this supported the conclusion that the Glock was fired in response to the attack on Baker. Finally, after the Escort crashed, two men were seen running together down Terra Villa, away from Garden and the vigil. Since there was no evidence that anyone else with a motive to kill Baker was at the scene, the most reasonable conclusion is that Rivera and Coneal both shot Baker and then were shot at themselves by someone at the vigil. In short, there was substantial evidence that Rivera was guilty of murder under current law because he was an actual killer.

C.    *Rivera's* Miranda *Claim Lacks Merit.*

Rivera also claims that the admission of statements he made to a sheriff's deputy violated *Miranda*. The claim fails.

1.    Additional facts

Before the evidentiary hearing, Rivera moved under *Miranda* to exclude statements he made to a deputy sheriff while he was in jail in Santa Clara County. The People opposed the motion, and the deputy testified subject to a motion to strike.

In the spring of 2013, Rivera was incarcerated in Santa Clara County for unlawfully possessing a firearm, a charge of which he was later convicted. On April 30, after Rivera returned to jail from court, the deputy transported him to his housing unit. At the time, the deputy did not know why Rivera was in jail, but he subsequently learned that Rivera was in custody "for

15

weapon-related charges" and was "the subject of a murder investigation" in Milpitas.

The deputy testified that he asked Rivera "how court had gone," and Rivera responded, "Good, man. I just beat a murder rap." The deputy then said "something along the lines of, Wow, that's not a normal response. Sounds like you are actually saying you beat an actual murder rap [as] opposed to just beat some bogus charges." Rivera responded, "That's exactly what I'm saying. I got away with it."

The deputy admitted that about seven weeks before this conversation, he had a negative interaction with Rivera. Rivera asked the deputy to return a towel the deputy had confiscated from him. When the deputy refused, Rivera "threw a tray of food past [him], striking a wall behind [him]." The deputy asked Rivera to lie down on the ground, but Rivera refused and took "a combative stance" with his fists raised. The deputy then pepper sprayed him. According to the deputy, despite this incident he did not recognize Rivera when he was transporting him back to his housing unit until he identified Rivera by name.

After the deputy testified, the trial court denied Rivera's motion to exclude the deputy's statements under *Miranda*. Although the court found that the deputy "was at times evasive" and "gave many nonresponsive answers," there was no evidence that he interrogated Rivera or that there was a change in Rivera's custody level requiring *Miranda* warnings.

2.    Analysis

Rivera argues that his statements to the deputy should have been excluded because the deputy's questioning amounted to a custodial interrogation and no *Miranda* warnings were given. We agree with the Attorney General, however, that *Miranda* does not apply in section 1172.6

16

proceedings. We also agree that even if *Miranda* error had occurred, it was harmless.

Under the Fifth Amendment, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) "To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of the custodial setting [citation], [*Miranda*] adopted a set of prophylactic measures requiring law enforcement officers to advise a suspect of [the suspect's] right to remain silent and to have counsel present prior to any custodial interrogation." (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 15–16.)

Because Rivera's *Miranda* claim does not involve any factual disputes, we review the trial court's admission of his statements de novo. (See *People v. Keo* (2019) 40 Cal.App.5th 169, 179.) In doing so, we consider "the correctness of the court's ruling, not its reasoning." (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1254.)

In *People v. Myles* (2021) 69 Cal.App.5th 688, this division held that "the wrongful admission of evidence" in proceedings under former section 1170.95 "does not implicate [a] defendant's constitutional rights under the Fifth Amendment." (*Myles*, at p. 706.) We explained, "The Fifth Amendment privilege against self-incrimination protects persons from being compelled by ' "governmental coercion" ' to serve as witnesses against themselves in ' "any *criminal case*." ' [Citation.] A section 1170.95 hearing, however, ' "is not a trial *de novo* on all the original charges." [Citation.] Rather, it is a *postconviction* proceeding "due to the Legislature's inclusion of section 1170.95 in Senate Bill No. 1437 . . . , [as] an 'act of lenity' [citation], allowing for the retroactive application of the new law governing accomplice liability . . . for defendants already serving valid sentences for murder." ' "

(*Id.* at pp. 705–706.)  Thus, "[b]ecause a sentence modification under section 1170.95 is an act of lenity and not a criminal trial," the defendant could not argue that she was entitled to use immunity to protect her Fifth Amendment rights.  (*Id.* at pp. 704–706.)

Rivera does not acknowledge *Myles* in his briefing, even though the Attorney General explicitly relies on it to argue that *Miranda* does not apply in this proceeding.  Thus, Rivera fails to give us any reason to revisit our holding in *Myles* or any basis on which to distinguish that decision.  We conclude that the trial court did not err by admitting Rivera's statements to the deputy despite the lack of *Miranda* warnings, because Rivera's Fifth Amendment privilege against self-incrimination is not implicated here.  (*People v. Myles*, *supra*, 69 Cal.App.5th at pp. 705–706.)

Even if *Miranda* applied, we would conclude that the admission of Rivera's statements was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Roberts* (2021) 65 Cal.App.5th 469, 480.)  We disagree with Rivera that his statements were "tantamount to a confession to murder," or at least a confession to *Baker's* murder.  It is difficult to discern why Rivera would refer to "beating a murder rap" in *this* case upon returning from court in a different county.  If anything, it appears that he may have been referring to a different murder case in which he was involved.  Moreover, the trial court found that the deputy was sometimes evasive, and it indicated it would "weigh that in accordance with weighing his testimony in its entirety."  The court's failure to mention Rivera's supposed confession in its detailed ruling denying the resentencing petition further suggests that it did not rely on the deputy's testimony to deny relief.  And finally, as discussed above, there was significant other evidence that Rivera

18

was an actual killer of Baker. Thus, we conclude that the evidence at issue did not affect the outcome.

## III.
### DISPOSITION

The May 5, 2023 order denying Rivera's resentencing petition is affirmed.

_____

Humes, P.J.



WE CONCUR:



_____

Langhorne Wilson, J.



_____

Siggins, J.*



\*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Rivera*  A168011


20