Filed 2/28/25  P. v. Jimenez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082752 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1901622) |
| GERARDO JIMENEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Jeffrey M. Zimel, Judge.  Affirmed, sentence vacated in part, and remanded with directions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Gerardo Jimenez of murder (Pen. Code,[1] § 187, subd. (a); count 1), and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2.) It found true an allegation as to count one that Jimenez personally and intentionally discharged a firearm causing death. (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8).)

The court sentenced Jimenez to an aggregate term of 50 years to life in state prison: 25 years to life on count 1 plus 25 years for the gun enhancement. It stayed the count 2 sentence under section 654.

Jimenez contends: (1) the court prejudicially erred by admitting into evidence the victim's statements made approximately two weeks before the murder; (2) the prosecutor committed misconduct during closing arguments and alternatively, defense counsel provided ineffective assistance by failing to object to those arguments; (3) the matter should be remanded for resentencing on the enhancement because the court was unaware of its discretion under section 1385; and (4) the trial court erroneously calculated his actual custody credits. The People concede and we agree the last contention has merit. We also conclude the court should resentence Jimenez on the gun enhancement in light of section 1385. Accordingly, we affirm the judgment of conviction, vacate the sentence on the enhancement, and remand with directions set forth below.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

B.C. testified that in early January 2019, she was living in an encampment described as "a community of trailers or RV's, things like that, that was off the grid in the hills near Perris." She knew Jimenez, who lived in the same area. Around that time, she witnessed an incident between

---

[1] Undesignated statutory references are to the Penal Code.

2

Jimenez and the victim, Rafael Quintero: "[Quintero] came in the trailer area really fast in his truck and [Jimenez] told him to slow down, that there was kids and dogs in there, that he needed to watch out. And [Quintero] got mad and took out his gun and shot around [Jimenez's] feet." B.C. heard Jimenez tell Quintero that "if [Quintero is] going to take out a gun, it's to use it, and not to play with it . . . if [Quintero] doesn't kill him, that he is going to kill [Quintero]." Days afterwards, B.C. discussed the incident with Jimenez and he commented, "Well, it's not over because when you take out a gun, you are supposed to use it. It's to use it, not to show it off or to play with it."

At trial, B.C. did not remember some things she told the detectives about the incident. But the parties stipulated that an investigator would testify B.C. had reported that after the incident when Quintero drove through the encampment, Jimenez told her he was going to Anza to get his guns.

B.C. testified she used drugs around the time of the incident, and still struggled with drug use at the time of trial. She had prior felony theft convictions, and testified under a grant of immunity.

E.B. testified that in early January 2019, when she was living in the same encampment, Quintero sped through it and Jimenez reprimanded him for that. E.B. recounted Quintero's response in the following colloquy:

[E.B.]: [Quintero] pretty much told [Jimenez] he wasn't going to tell him what to do and—

[Defense counsel]: Objection. Hearsay.

[The court]: Overruled.

[Prosecutor]: You can continue.

"[E.B]: [Quintero] pretty much told [Jimenez] he wasn't going to tell him what to do and [Quintero] did pull a gun out on [Jimenez] and shot . . . ."

3

Later that same day, Jimenez told E.B. that "he was going to get [Quintero] because nobody pulls out a gun on him and not shoots [*sic*] him."

Approximately two weeks later, E.B. was in her RV and saw Quintero looking through a junk pile that Jimenez owned. Jimenez showed up and was talking angrily with Quintero. E.B. heard a gunshot, and saw Quintero holding his chest area. Quintero told Jimenez, "Help me. Please call the ambulance." E.B. did not see Jimenez make a telephone call. E.B. heard another gunshot and saw Jimenez was still arguing with Quintero. She saw Quintero returning to his vehicle, followed by Jimenez, who had a revolver in his hand. E.B. shortly afterwards saw Jimenez shoot Quintero, who slumped over in his car, which crashed into another vehicle.

The next day, Jimenez told E.B.: "[I]f somebody came looking for [Quintero] or if anything happened, for [her] to come up with a bogus lie—a bogus story about if we seen him [*sic*] on the property." E.B. told Jimenez she did not want to get involved in the matter.

E.B. testified she was a drug user around the time of the incident, but she had stopped using drugs by the time of trial.

An autopsy showed Quintero died from multiple gunshot wounds.

In closing arguments, the prosecutor mentioned Quintero's conduct in driving through the encampment: "A week before the murder, or two weeks—we're not sure exactly the date that the first incident happened. We know that [E.B. and B.C.] both testified to this earlier incident. We know that there was an argument over [ ] Quintero driving too fast through the neighborhood. [He] did not want to submit to [Jimenez's] authority. 'He's not the boss of me. He can't tell me what to do.' [¶] Now, his reaction clearly was not correct. He shouldn't have done it. Shooting a gun at the ground wasn't the right choice, but it happened and it provoked [Jimenez's] anger.

4

[¶] He told not one but two people, 'I'm going to get him. If you pull a gun out on me, you better kill me and you better use it,' with the implication being, 'If you didn't kill me, I'm going to kill you.' That is motive and that is also premeditation."

B. *Defense Case*

Jimenez did not present any trial testimony. His counsel stated his theory of the case in closing arguments: "[Jimenez] is not guilty. There is no credible, verifiable, or reliable evidence that he killed Mr. Quintero."

DISCUSSION

I. *The Court's Admission of Quintero's Statement*

Jimenez contends that during E.B.'s testimony, the court erroneously admitted Quintero's hearsay statement. He further contends the error violated his Confrontation Clause rights under the Sixth Amendment of the federal Constitution. He contends the error was prejudicial because "[i]t provided a basis for jurors to infer that even before the incident, [he] disliked [Quintero]. Given that the defense was [Jimenez] was not the perpetrator, evidence showing bad relations between the two diminished the defense. It gave reason for the jurors to consider [Jimenez] a likely perpetrator. The prosecution also relied on the statement to prove [Jimenez] had planned the murder. . . . Also, the prosecution did not have an airtight case; its two primary witnesses admitted to drug addiction at the time of the incidents, one testifying she still was using drugs."

A. *Applicable Law*

Hearsay evidence is statutorily defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) In other words, "a hearsay statement is one in which a person makes a

5

factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true.  Hearsay is generally inadmissible unless it falls under an exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674.)

We review a trial court's ruling admitting evidence for abuse of discretion, and our task is to determine whether the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner resulting in a miscarriage of justice. (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.)  "Even if a trial court abuses its discretion in admitting hearsay evidence, we do not reverse unless there is a reasonable probability the defendant would have achieved a more favorable result absent the out-of-court statement." (*People v. Lozano* (2024) 101 Cal.App.5th 366, 381-382.)

"Relevant evidence" is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including the credibility of a witness. (Evid. Code, § 210.)  Evidence is relevant if it tends logically, naturally or by reasonable inference to establish or negate a material fact.  "Only relevant evidence is admissible (Evid. Code, §§ 210, 350), and all relevant evidence is admissible unless excluded under the federal or state Constitutions or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d); *People v. Heard* (2003) 31 Cal.4th 946, 972-973.)  "The test of relevance is whether the evidence 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' [Citation.]  The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence." (*People v. Cowan* (2010) 50 Cal.4th 401, 482.)

B. *Analysis*

Quintero's statement that Jimenez was not going to tell him what to do was not admitted for the truth of the matter stated but to show its effect on Jimenez. For that reason, it was not hearsay. Jimenez's state of mind was relevant because he responded to Quintero's statement by mentioning to B.C. and E.B. his intention to get back at Quintero for challenging Jimenez and firing a gun near to him. Jimenez later took actions to accomplish his intent; specifically he shot Quintero three times, killing him. Accordingly, we conclude that the trial court did not abuse its discretion by admitting into evidence Quintero's relevant statement for a non-hearsay purpose. (Accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 821 [concluding the trial court did not abuse its discretion to the extent it admitted evidence of a statement for its effect on defendant and notwithstanding that the statement was communicated to him seven months before the murders].)

Even if the court erroneously admitted Quintero's statement under Evidence Code section 1250, subdivision (d)(2),[2] in light of the overwhelming evidence of Jimenez's guilt, the error was harmless under either the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836) for assessing the prejudicial effect of state error or the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24) for evaluating the prejudicial effect of federal constitutional error. (Accord, *People v. Jablonski, supra,* 37 Cal.4th at pp. 820-821.) Here, such evidence included Jimenez's response to the first altercation, when he threatened to get back at Quintero, and stated he would

---

[2] Evidence Code section 1250, subdivision (a)(2) provides: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] . . . [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

7

go to Anza for his guns. As E.B. testified, just before the murder, she saw Jimenez holding a gun and arguing with Quintero. She also saw him shoot Quintero. Jimenez did not respond to Quintero's request to call an ambulance, instead, he fired two more shots at him, causing his death. After the incident, Jimenez showed consciousness of guilt by trying to induce E.B. to tell a false story about what had occurred. In light of such overwhelming evidence of murder, we conclude beyond a reasonable doubt that Jimenez would not have received a more favorable result had the trial court excluded from evidence Quintero's statement from the first altercation.

Jimenez's Confrontation Clause claim, raised for the first time on appeal, is forfeited. (*People v. Redd* (2010) 48 Cal.4th 691, 730 and fn. 19.) Nonetheless, the same prejudice analysis set forth above applies to this claim and even if it was not forfeited, any error is harmless beyond a reasonable doubt.

II. *Prosecutorial Error and Ineffective Assistance of Counsel Claims*

Jimenez contends the prosecutor committed two instances of misconduct during closing arguments. First, the prosecutor commented about E.B.'s testimony: "She [E.B.] sat on the stand and became emotional. She cried. But when she needed to, she found inner strength and she testified firmly and honestly. . . . [¶] . . . [¶] . . . From my perspective, I thought she was as fair as she could be."

Second, the prosecutor said regarding B.C.: "But I would submit to you, you don't have to be as harsh on her as it may appear. She did her best." Jimenez maintains these remarks improperly vouched for the witnesses' credibility by relying on "what was outside the evidentiary record."

8

A. *Background*

During E.B.'s direct examination, the prosecutor showed her a photograph of Quintero, and set forth her reaction on the record: "It looked to me like you are getting a little bit emotional. There are some tissues in front of you. If you need to take a break or take some time, let me know." The prosecutor asked why she got emotional, and she replied she had seen Quintero die. She agreed his death had affected her deeply.

In closing arguments, while discussing the court's jury instructions on evaluating conflicting evidence (CALCRIM No. 302);[3] eyewitness

---

[3] The court instructed the jury with CALCRIM No. 302: "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

identification (CALCRIM No. 315)[4] and evaluating witness credibility (CALCRIM No. 316),[5] the prosecutor reminded the jury about E.B.'s demeanor while testifying: "You were here. You observed her. Did that look like a person who wanted to be here or a person who wanted to tell lies? She

---

[4] The court instructed with CALCRIM No. 315 as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] Are the witness and the defendant of different races? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] How certain was the witness when he or she made an identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. [¶] If the People have not met this burden, you must find the defendant not guilty."

[5] The court instructed with CALCRIM No. 316: "If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable. If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

10

sat on the stand and became emotional.  She cried.  But when she needed to, she found inner strength and she testified firmly and honestly.  She said, 'I know myself.  I know my person.  I know I'm telling the truth.'  You all know how to judge people's demeanor.  You saw her.  You saw what you needed to see."

Pointing out E.B. had testified Jimenez was a "good guy" who had helped her out, the prosecutor reasoned, "If [E.B.] had something against [Jimenez], why would she say, 'He was a good guy to me before I saw him murder somebody?' "  The prosecutor addressed her attitude while testifying: "Did she seem like she was trying to help me and trying to hurt the defense?  From my perspective, I thought she was as fair as she could be."

The prosecutor made the second challenged statement in reference to B.C.'s testimony that she did not remember if she had earlier told law enforcement that Jimenez had said he was going to Anza to pick up his guns: "Now, did [B.C.] have a motive to lie?  None was presented.  None was apparent.  So really the only questions are whether she had inconsistent statements . . . .  [¶]  . . . [B]ut I want you to think about whether her statements are really inconsistent or just different versions of the same thing.  She said some things differently than what she said before.  But in the end, did she say, 'Actually, no, I didn't see what I saw.  Or no I didn't hear what I heard[?]'  [¶]  So her credibility is for you to judge.  But I would submit to you, you don't have to be as harsh on her as it may appear.  She did her best.  And ultimately, the point of her testimony was she heard the very same threat that [E.B.] heard."

B. *Prosecutorial Error Claim*

To preserve a claim of prosecutorial error, a "defendant must generally object 'in a timely fashion—and on the same ground,' and must 'request[ ]

11

that the jury be admonished to disregard the impropriety.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29.)  As Jimenez concedes, he did not object to the prosecutor's arguments and did not request an admonishment; therefore, he has forfeited his claims of prosecutorial error.

While we do have the discretion to excuse forfeiture, such discretion is to be exercised sparingly.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Moreover, the forfeiture requirement serves an important purpose. Defendants must raise a prosecutorial error claim during trial, where it can be remedied at once in a far more efficient and effective manner than on appeal.  (See *People v. Peoples* (2016) 62 Cal.4th 718, 801 [reason for the forfeiture rule is that the trial court should be given the opportunity to correct the misconduct of counsel and thus, if possible, prevent the harmful effect on the minds of the jurors].)  We decline to exercise our discretion to excuse Jimenez's failure to object because as we set forth below, he has failed to show prejudice from the prosecutor's arguments.  Therefore, even if he had objected, it is not reasonably probable he would have received a different result.  (*People v Davis* (2009) 46 Cal.4th 539, 612 [setting forth the standard of review].)

C.  *Ineffective Assistance of Counsel*

Jimenez alternatively argues his trial counsel rendered constitutionally ineffective assistance by failing to object to the prosecutor's purported vouching:  "[T]he prosecutor relied on what was outside the evidentiary record when asserting that [E.B.] testified from inner strength, honestly and fairly, and that [B.C.] did the best she could.  There was no evidence that [E.B.'s] testimony was from inner strength or that she was being fair and honest.  That she had been addicted to drugs did not provide an evidentiary basis for the comment.  The same can be said for [B.C.'s] testimony.  That she

12

lived in the Hills and had used drugs did not supply an evidentiary basis for the prosecutor's comment that her testimony reflected her best efforts. What the prosecutor's comments did was serve as a request for jurors to empathize and be more lenient with these witnesses because of their struggles and agree with his opinion that these witnesses were honest and credible, an opinion not entirely based on the evidence."

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To demonstrate prejudice, a defendant must show a reasonable probability that the defendant would have achieved a more favorable result had counsel's performance not been deficient. (*Strickland,* at pp. 693-694; *Ledesma,* at pp. 217-218.)

The prosecution bears the burden of proving all elements of the crimes charged beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 364.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

" 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.] Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[ ]

13

to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination." ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

In reviewing such claims, we give significant deference to trial counsel's reasonable tactical decisions, and the " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 437, quoting *Strickland, supra,* 466 U.S. at p. 689.) " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) And it is "particularly difficult" for a defendant to prevail on direct appeal on a claim of ineffective assistance by trial counsel. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The prosecutor's challenged comments did not amount to vouching; rather, they related to the trial evidence and in particular two witnesses' demeanor. The prosecutor was referring to what the jury saw and heard in light of the court's jury instructions. Further, there is no reasonable likelihood the jury misunderstood the prosecutor's comments, as he encouraged the jury to rely on its own impressions of the witnesses' demeanor to judge their credibility. He said regarding E.B, "You all know how to judge people's demeanor. You saw her." And he said regarding B.C., "So her credibility is for you to judge." The California Supreme Court has explained: " '[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 337.)

Finally, the court's jury instructions support our conclusion. Generally, we assume "the jury followed the court's instructions and not the argument of

14

counsel." (*People v. Valdez* (2004) 32 Cal.4th 73, 114, fn. 14.)  The instructions in this case included the proposition that the attorneys' statements are not evidence.  (CALCRIM No. 222.)  The jury was further instructed that, "You alone must judge the credibility or the believability of the witnesses."  (CALCRIM No. 226.)  On this record, we conclude defense counsel did not render deficient performance by failing to object to the prosecutor's challenged arguments.  "Counsel is not required to proffer futile objections."  (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

### III.  *The 25-Year-to-Life Enhancement Term*

Jimenez contends we should remand the matter for resentencing because the court "appeared unaware of the scope of its sentencing discretion, that it could strike his firearm enhancement or impose a lesser uncharged enhancement" under section 1385 subdivision (c)(2).

The People respond that absent evidence to the contrary, it is presumed that a trial court knew and applied the governing law, pointing out Jimenez was sentenced more than a year after section 1385 subdivision (c)(2)'s effective date.

Section 1385 provides that, with an exception not applicable here, a court "[n]otwithstanding any other law, . . . shall dismiss an enhancement if it is in the furtherance of justice to do so . . . ."  (§ 1385, subd. (c)(1); see *People v. Walker* (2024) 16 Cal.5th 1024, 1033; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 295.)  Section 1385, subdivision (c)(2) provides:  "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of [nine listed] mitigating circumstances . . . are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement

15

would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

"Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) Where the trial court fails to recognize the full scope of its discretion, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 424.)

Here, we cannot presume the trial court was aware of its discretion to strike or dismiss the enhancement under the changed law because in sentencing Jimenez on the section 12022.53, subdivision (d) enhancement, the court's remarks reflect an understanding it had no discretion: "For the allegation that you personally discharged a firearm, *the court imposes the sentence required by law*, which is 25 years to life in state prison. That will be consecutive to the sentence imposed for Count 1." (Italics added.) Similarly, to the extent the court relied on the probation report, it did not reflect the change in the law either: "Any person who personally and intentionally discharges a firearm and proximately causes as defined in section 12022. 7, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for . . . 25 years to life." The record does not show the court would have reached the same conclusion if it knew of its discretion; accordingly, remand is

16

appropriate. We express no opinion on how the court should exercise its discretion.

IV. *The Abstract of Judgment Should Be Corrected*

The People concede and we agree that the court miscalculated Jimenez's actual custody credits, and that he is entitled to 15 additional days.

Jimenez was arrested on April 10, 2019, and his original sentencing date was May 11, 2023, thus the probation department calculated 1,493 days of presentence custody credits, up to and including that date. And the court awarded those credits. However, as the sentencing was continued until May 26, 2023, the court should have updated its calculations. On remand, the court is directed to correct the abstract of judgment.

DISPOSITION

The judgment of conviction is affirmed. The court is directed to resentence Jimenez on the section 12022.53, subdivision (d) enhancement consistent with this opinion, prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

DO, J.

17